Maro Burunsuzyan, Esq., SBN 175369
marob@marolaw.com
Simon Y. Song, Esq., SBN 283269
simons@marolaw.com
**LAW OFFICES OF MARO BURUNSUZYAN**
*A Professional Law Corporation*
800 North Brand Boulevard, 8th floor
Glendale, CA 91203
Telephone: (818) 507-5188
Facsimile: (818) 507-5199

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATRENDA BURRIES, GLORIBEL GARCIA, and KATLEEN SATURNÉ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CCC INTELLIGENT SOLUTIONS INC., a Delaware corporation; and CCC INTELLIGENT SOLUTIONS HOLDINGS INC., a Delaware corporation,<br><br>Defendants. | Case No. 2:26-cv-11794<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. INTRUSION UPON SECLUSION;**<br>**2. INVASION OF PRIVACY (CAL. CONST., ART. I, § 1);**<br>**3. UNJUST ENRICHMENT (QUASI-CONTRACT CLAIM FOR RESTITUTION); AND**<br>**4. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (BUS. & PROF. CODE § 17200)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs LaTrenda Burries, Gloribel Garcia, and Katleen Saturné, individually and on behalf of all others similarly situated (collectively, "Plaintiffs"), bring this Class Action Complaint against Defendants CCC Intelligent Solutions Inc. ("CCC Inc.") and CCC Intelligent Solutions Holdings Inc. ("CCC Holdings") (collectively, "CCC"), and



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

allege upon personal knowledge as to their own acts, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1. Every year, millions of consumers across the United States bring damaged vehicles to collision repair facilities after an automobile accident, and in the ordinary course of that process a consumer provides, and a repair facility or an insurer records, information about the consumer and the consumer's vehicle, including, among other things, the consumer's name, residential address, telephone number, insurance policy and claim identifiers, vehicle identification number, license plate number, vehicle mileage, and the make, model, and year of the vehicle, together with the resulting repair estimate and claim records (collectively, "Personal Information"). Personal Information recorded in connection with a repair or claim is named, addressed, and individually identifiable to the consumer. A consumer who provides that Personal Information reasonably expects it to travel only within a closed path, from the consumer to the collision repair facility and the insurer that are handling the repair and the claim, and then back to the consumer, for the limited purpose of estimating, repairing, and settling that consumer's loss.

2. CCC is the one participant in that transaction whom the consumer never deals with. CCC licenses a cloud-based software platform, marketed as CCC ONE, to more than 30,500 collision repair facilities and more than 300 insurers, which use it to write repair estimates and process claims. On information and belief, when a repair facility enters a consumer's Personal Information into CCC ONE, that Personal Information is transmitted to and stored on CCC's own servers. The consumer is not a party to CCC's contract with the repair facility, and CCC never asks the consumer to agree to any terms.



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

The estimate prepared with the consumer's Personal Information identifies CCC as the maker of the estimating software and says nothing about what CCC does with the consumer's Personal Information.

3. CCC does not stop at the estimate. On information and belief, CCC keeps the Personal Information, combines it with data from across its network of repair facilities and insurers, and uses it to build artificial-intelligence products and analytics that CCC licenses to its other customers. CCC's own documents describe that practice. CCC tells investors that it has "processed more than $2 trillion of historical data across our network" and has "developed more than 400 AI models." Its contract with insurers provides that "CCC may use data to train AI Services." Its contract with repair facilities reserves to CCC the use of the facility's data for CCC's own "product improvement, and research and development," a use that "may continue after the expiration or termination of this Agreement."

4. CCC tells consumers none of this. No page of the estimate describes CCC's retention, aggregation, or commercial use of the Personal Information, or gives the consumer any way to opt out of it, see it, or delete it. CCC's privacy policy appears only on CCC's own website, and no version in effect since April 2020 mentions artificial intelligence or model training. Instead, the policy tells consumers that CCC acts "as a service provider" for repair shops and insurers and sends them back to those businesses. When a consumer wrote to CCC in 2025 to ask what it held about him, CCC confirmed that it had "one record of a repair with a shop" and answered, "we cannot take any action."

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

5. A repair facility's contract with CCC is not the consumer's consent. A consumer who gives Personal Information to a repair shop to fix a vehicle does not agree that an unseen software company may keep it and turn it into products for other businesses. CCC's own contract anticipates as much by requiring the repair facility to indemnify CCC "for failure to obtain the requisite authorizations." The wrong begins when CCC takes the consumer's identifiable record into its own data assets for its own purposes, and it continues each time CCC retains, aggregates, or uses that record; any later de-identification neither notifies the consumer nor undoes CCC's appropriation of that record. By taking and using the Personal Information beyond the consumer's own repair, without notice, consent, or compensation, CCC intrudes upon the consumer's seclusion, invades the privacy protected by Article I, Section 1 of the California Constitution, is unjustly enriched, and engages in unlawful and unfair business practices under California's Unfair Competition Law.

6. Plaintiffs bring this action on behalf of themselves and the proposed Class (defined in ¶ 110) to redress CCC's collection, retention, aggregation, and commercial use of the Class's Personal Information without notice to, consent from, or compensation to the consumers to whom that Personal Information belongs. Plaintiffs assert causes of action for Intrusion Upon Seclusion; Invasion of Privacy Under Article I, Section 1 of the California Constitution; Unjust Enrichment (Quasi-Contract Claim for Restitution); and Violation of California's Unfair Competition Law, California Business and Professions Code section 17200. Plaintiffs seek restitution and disgorgement of the profits CCC obtained from the Class's Personal Information, compensatory relief as allowed by law, and declaratory and injunctive relief requiring CCC to stop the challenged practices, to

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

delete the Personal Information and the artificial-intelligence models built from it, and to account for and relinquish the benefits it obtained.

**JURISDICTION AND VENUE**

7. This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, the proposed Class comprises more than 100 members, and at least one member of the proposed Class is a citizen of a State different from at least one Defendant. Minimal diversity is satisfied because CCC Holdings is a citizen of Delaware, where it is incorporated, and, on information and belief, of Illinois, where its principal executive offices are located and where it maintains its principal place of business, and CCC Inc. is likewise a citizen of Delaware, where it is incorporated, and, on information and belief, of Illinois, where its principal offices are located (¶ 17), while Plaintiffs are citizens of California.

8. This Court has authority to declare the rights and legal relations of the parties under the Declaratory Judgment Act, 28 U.S.C. § 2201, because an actual and justiciable controversy exists between Plaintiffs and CCC concerning the lawfulness of CCC's collection, retention, aggregation, and use of the Class members' Personal Information and concerning CCC's obligations to the Class members.

9. This Court has personal jurisdiction over CCC because CCC purposefully directs its business at California, including at collision repair facilities located within the Central District of California. CCC licenses its CCC ONE platform to collision repair facilities, including through CCC's form Automotive Services Master License Agreement with a California collision repair facility (the "Repair Facility License Agreement"), and

CCC contracts with insurers under its form Master Services Agreement for insurers (the "Insurer MSA"), maintaining customer agreements with more than 300 insurers across the United States. CCC Inc. is the party that licenses CCC ONE to collision repair facilities under the Repair Facility License Agreement, and it is identified as the provider of the CCC ONE Estimating product on the estimates that collision repair facilities in this District generate, including the estimates prepared for Plaintiffs Burries and Garcia (¶¶ 17, 30, 68). Through collision repair facilities operating in this District, CCC collects, receives, and stores the Personal Information of residents of this District, and Plaintiffs' claims arise directly out of and relate to those contacts, including CCC's collection and storage of Plaintiff Burries's Personal Information, which a collision repair facility entered into CCC ONE in this District in connection with the automobile claim of the adverse driver's insurer, State Farm, and of Plaintiff Garcia's and Plaintiff Saturné's Personal Information, which collision repair facilities in Los Angeles entered into CCC ONE in this District.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Plaintiff Burries's Personal Information was entered into CCC ONE in connection with an estimate for the repair of her vehicle prepared at a collision repair facility in Redlands, San Bernardino County, within this District. Plaintiff Garcia's and Plaintiff Saturné's Personal Information was entered into CCC ONE in connection with estimates for the repair of vehicles prepared at collision repair facilities in Los Angeles, Los Angeles County, also within this District.

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

11. Venue is independently proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because CCC resides in this District for venue purposes. Each Defendant is a corporation that is subject to this Court's personal jurisdiction in this action, a corporate defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction, and, in a State with more than one judicial district, a corporate defendant is deemed to reside in any district within which its contacts would subject it to personal jurisdiction if that district were a separate State.

12. Assignment to the Western Division is proper because Plaintiffs Garcia and Saturné, two of the three Plaintiffs, reside in Los Angeles County, which lies within the Western Division of this District, and a substantial part of the events giving rise to their claims occurred in Los Angeles County.

**PARTIES**

13. Plaintiff LaTrenda Zekenya Burries ("Plaintiff Burries") is a natural person who resides in Redlands, San Bernardino County, California, and is a citizen of California. On November 29, 2025, Plaintiff Burries was involved in an automobile collision in Redlands that damaged her 2018 Honda Odyssey. Plaintiff Burries took her vehicle to a Caliber Collision repair facility located in Redlands, San Bernardino County, where an estimator prepared a CCC ONE estimate on December 8, 2025 in connection with the automobile claim of the adverse driver's insurer, State Farm.

14. The CCC ONE estimate prepared for Plaintiff Burries's vehicle contains, on its face, categories of her Personal Information, including her name, home address, telephone number, the vehicle identification number, the license plate number, the insurance claim number, and the vehicle mileage. The estimate attributes the CCC ONE

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Estimating product to CCC by name through the legend "CCC ONE Estimating - A product of CCC Intelligent Solutions Inc." Nothing in the estimate informed Plaintiff Burries that CCC would retain, aggregate, or use her Personal Information for any purpose beyond the preparation of the estimate, and the estimate contains no CCC consumer-facing text message, link, mobile application, QR code, or portal directed to Plaintiff Burries. In connection with the repair and claim at issue, Plaintiff Burries did not use CCC's Quick Estimate or any other CCC-hosted consumer application or website, and did not accept any terms of use or end-user agreement presented by CCC.

15. Plaintiff Gloribel Lissbeth Garcia ("Plaintiff Garcia") is a natural person who resides in Los Angeles, Los Angeles County, California, and is a citizen of California. On September 23, 2026, Plaintiff Garcia was driving a 2022 Nissan Sentra, on which she is a named insured, when it was struck from behind by another vehicle in the Eagle Rock neighborhood of Los Angeles. Matrix Collision Repair Facility, a collision repair facility located in Los Angeles, Los Angeles County, recorded that the vehicle was dropped off on September 30, 2026 and that repairs began on October 1, 2026, and on October 1, 2026 its estimator prepared a CCC ONE estimate of record for the vehicle in connection with the claim of the adverse driver's insurer, State Farm. The estimate identifies Plaintiff Garcia as the owner of the vehicle and contains, on its face, categories of her Personal Information, including her name, home address, telephone number, the vehicle identification number, the license plate number, the insurance claim number, and the vehicle mileage. The estimate bears a CCC Data Date of September 16, 2026, separate from the date the repair facility generated the document, and attributes the CCC ONE Estimating product to CCC by name through the legend "CCC ONE Estimating - A

product of CCC Intelligent Solutions Inc." Nothing in the estimate informed Plaintiff Garcia that CCC would retain, aggregate, or use her Personal Information for any purpose beyond the preparation of the estimate, and the only web addresses the estimate contains are those of the insurer. In connection with the repair and claim at issue, Plaintiff Garcia did not use CCC's Quick Estimate or any other CCC-hosted consumer application or website, and did not accept any terms of use or end-user agreement presented by CCC.

16. Plaintiff Katleen Saturné ("Plaintiff Saturné") is a natural person who resides in Los Angeles County, California, and is a citizen of California. On January 29, 2024, while Plaintiff Saturné was stopped at a red light in Los Angeles, her 2018 GMC Terrain Denali was struck from behind by another vehicle. On January 30, 2024, Brown Bros. Auto Body & Paint Shop, a collision repair facility located in Los Angeles, Los Angeles County, prepared a CCC ONE preliminary estimate for the repair of the vehicle, which records the repair facility as the inspection location and records the vehicle's mileage. The estimate identifies Plaintiff Saturné as the customer, the insured, and the owner of the vehicle, and contains, on its face, categories of her Personal Information, including her name, home address, telephone number, the vehicle identification number, the license plate number, and the vehicle mileage. The estimate bears a CCC Data Date of January 17, 2024, separate from the date the repair facility generated the document, and its legend attributes the CCC ONE Estimating product to CCC by name, reading "CCC ONE Estimating - A product of CCC Intelligent Services Inc." On information and belief, that legend refers to CCC Inc., the provider of the CCC ONE Estimating product. Nothing in the estimate informed Plaintiff Saturné that CCC would retain, aggregate, or use her Personal Information for any purpose beyond the preparation of the estimate. In

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

connection with the estimate at issue, Plaintiff Saturné did not use CCC's Quick Estimate or any other CCC-hosted consumer application or website, and did not accept any terms of use or end-user agreement presented by CCC.

17. Defendant CCC Intelligent Solutions Inc. is a Delaware corporation with principal offices at 167 N. Green Street, 9th Floor, Chicago, Illinois 60607, and is an indirect wholly owned operating subsidiary of CCC Holdings. CCC Inc. is the entity identified as the provider of the CCC ONE Estimating product on the CCC ONE estimates that collision repair facilities generate. Effective June 1, 2021, CCC Inc. changed its corporate name from CCC Information Services Inc. to CCC Intelligent Solutions Inc. Under its former name, it is the entity named as "CCC" in the Repair Facility License Agreement and the entity to which the CCC patents described below were issued.

18. Defendant CCC Intelligent Solutions Holdings Inc. is a Delaware corporation with its principal executive offices at 167 N. Green Street, 9th Floor, Chicago, Illinois 60607. CCC Holdings is the parent of CCC Inc. and is the registrant that files the annual reports on Form 10-K on which the admissions alleged in this Complaint appear. The common stock of CCC Holdings is listed on The Nasdaq Stock Market LLC under the ticker symbol "CCC."

19. At all relevant times, each Defendant acted through its officers, directors, employees, and agents within the course and scope of their authority, and CCC Holdings directed and reported on the business that CCC Inc. conducts through CCC ONE (¶ 21).

20. References in this Complaint to CCC include CCC's predecessors, successors, and assigns, and the declaratory and injunctive relief sought runs against CCC together

with its successors and assigns. Plaintiffs do not name any fictitiously designated defendant.

21. CCC Inc. is the operating entity that licenses CCC ONE to collision repair facilities under the Repair Facility License Agreement (¶ 30), that is identified as the provider of the CCC ONE Estimating product on the estimates prepared for Plaintiffs Burries and Garcia (¶¶ 17, 68), and to which the patents described below were issued (¶¶ 17, 62). CCC Inc. remains CCC's contracting entity today: the Insurer MSA, last updated November 7, 2025, is made by and between CCC Intelligent Solutions Inc. and the customer, and CCC's companion data processing addendum, last updated November 4, 2025, supplements each agreement between CCC Intelligent Solutions Inc. or its affiliate and its customer (¶ 30). CCC Holdings is the public parent that, in its own name, reports on and directs the strategy of the business conducted through CCC ONE. In its own annual reports, CCC Holdings describes the historical data CCC has processed across its network and the proprietary data assets built from it (¶ 50), the artificial-intelligence models CCC has developed and the insurers and repair facilities that use them (¶ 51), and its expectation that it will expand its use and collection of personal information over time (¶ 53). In its own earnings release for the first quarter of 2024, CCC Holdings announced the CCC Intelligent Experience (IX) Cloud platform, which it described as orchestrating data and artificial intelligence across CCC's existing cloud applications and customer workflows. CCC Holdings paid 37.6% of the $674.3 million consideration for CCC's January 2025 acquisition of EvolutionIQ, Inc. ("EvolutionIQ") in shares of its own common stock (¶ 56).

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

## FACTUAL ALLEGATIONS

### A. CCC ONE Sits Inside the Consumer's Repair Transaction

22. CCC operates a cloud-based software platform, marketed as CCC ONE, that collision repair facilities and insurers use to prepare vehicle damage estimates and to document and process automobile repairs and insurance claims.

23. CCC Holdings files CCC's annual reports with the United States Securities and Exchange Commission. In its most recent Annual Report on Form 10-K, CCC Holdings states that CCC has "customer agreements with more than 300 insurers (including carriers, self-insurers and other entities processing insurance claims), including 27 of the top 30 automotive insurance carriers, and 9 of the top 15 disability insurance carriers in the U.S., . . ." and "more than 35,000 total customers, including more than 30,500 automotive collision repair facilities . . . ."

24. CCC Holdings reports that the platform processes "more than $200 billion of transactions annually for our more than 35,000 customers, . . ." and that it serves "over 888,000 registered users and 5.7 billion database transactions processed per day." That volume has grown rapidly: the Forms 10-K for fiscal years 2021 and 2022 reported that CCC processed "more than $100 billion of transactions annually for our more than 30,000 customers", a figure CCC Holdings now reports as more than $200 billion.

25. CCC receives the Personal Information at issue from the collision repair facilities and insurers that use its platform. In its current public privacy policy, CCC states that "[s]ome Services help you communicate with third parties about your vehicle, including repair facilities and insurance companies. These repair facilities and insurance companies may provide us with information about you."

26. On information and belief, when a collision repair facility or an insurer enters a consumer's Personal Information into CCC ONE to prepare an estimate or to process a claim, that Personal Information is transmitted to and stored on CCC's servers. CCC Holdings describes CCC's platform as operating "in a secure multi-tenant public cloud environment".

27. The Personal Information entered into CCC ONE in connection with a repair or claim identifies the consumer by name and by category. The estimate prepared for Plaintiff Burries through CCC ONE contains, on its face, the consumer's full name, home street address and apartment number, city, state, and ZIP code, telephone number, the insurer's name, the claim number, the policy type, the vehicle identification number, the license plate number, the vehicle mileage, the make, model, color, interior, and optional equipment of the vehicle, the identity of the insured, and the adjuster's contact information.

28. The estimate prepared for Plaintiff Burries through CCC ONE bears a "CCC Data Date" that is separate from the date the repair facility generated the document, as do the estimates prepared for Plaintiffs Garcia and Saturné (¶¶ 15-16), indicating that each estimate was generated from CCC's own estimating database, which CCC maintains and updates.

29. CCC also receives, processes, and stores photographs of the damaged vehicles. CCC Holdings reports that CCC receives, processes, and stores nearly 800 million photographs each year.

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

## B. CCC's Own Contracts Reserve to CCC the Commercial Use of Consumers' Personal Information

30. CCC's own form agreements with the businesses that feed CCC ONE state, in CCC's own words, what CCC may do with the Personal Information those businesses enter. They are the Repair Facility License Agreement, effective in 2018; CCC's form Independent Appraiser Master License Agreement, reflected in a product schedule executed in 2024 (the "Appraiser License Agreement"); the Insurer MSA, CCC's public Master Services Agreement for insurers, last updated November 7, 2025; and CCC's companion Data Processing Addendum, last updated November 4, 2025 (the "DPA"). The Repair Facility License Agreement is made "by and between CCC Information Services Inc. . . . its successors and assigns, and the customer that is identified on the Product Schedule," and CCC Information Services Inc. is the former name of CCC Inc. (¶ 17).

31. Section 8 of the Repair Facility License Agreement, titled "Data," provides:

> 8. Data. CUSTOMER hereby grants CCC full right and authority to use data supplied by CUSTOMER: (a) to be incorporated or used with the Programs and/or Services under this Agreement; (b) for the purpose of creating and providing reports and analysis to the CUSTOMER; (c) for any internal industry, market, and trend analysis, product improvement, and research and development by, or on behalf of, CCC and its affiliates; and (d) in de-identified form, within CCC's and its affiliates' products and services. Such use of this data may continue after the expiration or termination of this Agreement.

32. Section 29.10 of the Repair Facility License Agreement, titled "Authorization," provides:

> CUSTOMER hereby grants the insurance companies identified in (a) and (b) above, CCC and Flash perpetual, royalty-free licenses to use

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

> the Content. Notwithstanding the licenses above, neither CCC nor Flash will make the Content publicly available in de-aggregated form without CUSTOMER's or its Client's express authorization within CCC's and Flash's products. CUSTOMER understands and agrees that the Content may contain nonpublic personal information. CUSTOMER represents and warrants that it has full right and authority to provide the authorization and licenses contained herein and shall, at its own expense, indemnify, defend and hold CCC fully harmless against any action, costs or expenses asserted against CCC, including reasonable attorneys' fees, to the extent that such action, costs or expenses arise out of the transmission of the Content or use of the Content by CUSTOMER and Insurance Companies hereunder, including for failure to obtain the requisite authorizations.

33. Section 29.10 authorizes CCC to provide the repair "Content" to insurers whose direct repair programs the shop participates in, or with whom the shop configures CCC ONE UpdatePlus to share information, and separately authorizes CCC to provide the Content to CCC's vendor, Flash of Genius, Inc. (d/b/a UpdatePromise) ("Flash"), granting the identified insurers, CCC, and that vendor "perpetual, royalty-free licenses to use the Content."

34. Section 2.4(f) of the Repair Facility License Agreement, by contrast, forbids the repair facility itself to "compile estimate data for the purpose of creating a database", a use that CCC reserves to itself under Section 8.

35. Section 8 of the Appraiser License Agreement opens with the appraiser's warranty, "CUSTOMER represents and warrants that it has the right to provide the Data to CCC," and then grants CCC the same data-use rights as the repair facility's agreement, including use for CCC's internal industry, market, and trend analysis, product improvement, and research and development, and inclusion of the data in de-identified form within CCC's and its affiliates' products and services.

36. The Appraiser License Agreement likewise restrains the appraiser while CCC reserves commercial use to itself: Section 2.4(e) forbids the appraiser to "Compile estimate data for the purpose of creating a database", and Section 2.4(k) separately forbids the appraiser to "Aggregate or co-mingle data in the Programs and/or Services or provide reports or analysis based on data in the Programs and/or Services to anyone".

37. Section 7(c) of the Insurer MSA, titled "License by Customer to CCC," provides:

> c. License by Customer to CCC. Customer grants CCC, its Affiliates and applicable contractors and Sub-Processors a worldwide license to store within the United States, copy, use, transmit, and display Customer Data as appropriate for CCC: i. to provide and ensure proper operation of the Services; ii. to conduct and to provide to Customer, third parties, and the public industry, market and trend analyses, including for the purposes of marketing CCC and its products and services, provided that no such analysis provided to a third party or made public, or used for marketing purposes, is identifiable to Customer or to any of Customer's Authorized Users, insureds or third-party claimants; iii. to conduct, or cause to be conducted on CCC's behalf, research and development activities concerning products and services offered or proposed to be offered by CCC or its Affiliates, provided that all Customer Data is De-identified in connection with such use; and iv. to include the Customer Data, in De-identified form, within CCC's products and services.

38. Section 7(c) of the Insurer MSA continues at subpart (v):

> v. for anti-fraud detection purposes, to develop, maintain and utilize with CCC customers an anti-fraud database to detect fraud within insurance claims as instructed by Customer. (For the avoidance of doubt, Customer recognizes and agrees that this data will be used in a cross-carrier database regardless of whether Customer orders or uses any CCC anti-fraud product and that such use is not a sale of data.)

39. Section 7(d) of the Insurer MSA, titled "Data Authorizations," provides:

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

> d. Data Authorizations. From time to time, CCC and Customer may desire to conduct limited research and development activities beyond what is permitted in Section 7(c), above, including the development or testing of artificial intelligence tools or models using Customer Data which has not been De-identified, or for marketing purposes to Customer to demonstrate results of customer data inputted into CCC services not currently licensed by Customer. Prior to any such use, CCC will seek Customer instructions on these activities by providing a description of such activities, including the Customer Data proposed to be used, for Customer's review and written approval.

40. Section 7(d) thus contemplates the development or testing of artificial intelligence tools or models on Customer Data that has not been de-identified, subject only to the customer's prior written approval, which the provision states CCC may accept by e-mail from a vice-president-level or higher employee of the customer.

41. Section 13(c) of the Insurer MSA, titled "Artificial Intelligence," addresses the training of CCC's models directly: "For the avoidance of doubt, the parties acknowledge and agree that CCC may use data to train AI Services and otherwise in connection with CCC's use of AI and product offerings."

42. The DPA confirms the categories of Personal Information CCC processes. The DPA identifies the "Categories of Personal Data being Processed" as "name, email address, home address, and license plate number and/or such other categories as expressly set forth in the Agreement", and identifies the "Categories of data subjects/consumers" as "customers, consumers, and employees or contractors and/or such other categories as expressly set forth in the Agreement".

43. The DPA states that, "[w]ith respect to Customer Personal Data, CCC and Customer agree that CCC is acting as a Processor to provide Services to Customer and Customer is a Controller." Section 2(b) of the DPA nonetheless provides that "CCC may



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Process Aggregate Data and Deidentified Data for any purpose, commercial or otherwise in accordance with the Agreement ([section 7(c)])."

44. No consumer whose Personal Information these agreements collect, move, and license is a party or a signatory to any of them: the Repair Facility License Agreement runs between CCC and a collision repair facility, the Appraiser License Agreement runs between CCC and an independent appraiser, and the Insurer MSA and DPA run between CCC and an insurer.

45. The only authorization CCC obtains to take and use consumers' Personal Information under these agreements is the business's own promise: under the Repair Facility License Agreement, CUSTOMER "represents and warrants that it has full right and authority to provide the authorization and licenses contained herein", and indemnifies CCC "for failure to obtain the requisite authorizations"; and under the Appraiser License Agreement, CUSTOMER "represents and warrants that it has the right to provide the Data to CCC."

46. On information and belief, consumers are not shown, and are not asked to agree to, any of these agreements, which are CCC's own form contracts with its business customers; the CCC ONE estimate prepared with the consumer's Personal Information in connection with a repair or claim contains no comparable terms describing CCC's collection, retention, aggregation, or licensing of the consumer's Personal Information, and offers the consumer no opt-out, access, or deletion right.

47. A repair facility's or an insurer's contractual grant of rights to CCC is therefore not the consumer's consent, and as to the consumer whose Personal Information these agreements collect, store, and license, CCC is a stranger to the transaction the consumer

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

understood to be the repair or settlement of the consumer's vehicle. Section 29.10's indemnity "for failure to obtain the requisite authorizations" shows that CCC itself anticipated that the consumer's authorization might never have been obtained.

**C. CCC Converts Consumers' Personal Information into Artificial-Intelligence Products It Licenses to Insurers and Other Customers**

48. CCC describes itself to investors, insurers, and other customers as an artificial-intelligence company. In a press release dated August 1, 2024, CCC stated that it "introduced its first AI solution for vehicle damage assessment in 2013" and that its AI-powered solutions "have been adopted by more than 100 auto insurance companies and thousands of collision repair operators." In the same release, CCC stated that its solution offering "applies more than 300 AI models that leverage computer vision, natural language understanding and deep learning, to improve customer interactions, streamline operations, and digitize assessments across estimating, casualty and subrogation."

49. CCC's first in-production estimating artificial intelligence predates that release by years. On December 3, 2018, CCC announced CCC Smart Estimate as "the world's first in-production AI solution for vehicle collision estimates," a tool that uses CCC's estimating logic and photo-analytics capabilities to pre-populate an estimate for human estimators to review and advance, and through which "Smart Estimate AI and human estimators learn from each other" over time.

50. CCC accumulates data from the transactions processed through its platform. CCC Holdings states that CCC has "processed more than $2 trillion of historical data across our network, allowing us to build proprietary data assets that leverage insurance

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

claims, vehicle repair, automotive parts and other vehicle-specific information." Earlier filings reported "more than $1 trillion of historical data across our network."

51. CCC uses its accumulated data to build artificial intelligence products. CCC Holdings states that "CCC has developed more than 400 AI models, some of which are in use across more than 125 insurers, and more than 15,000 repair facilities."

52. CCC has publicly quantified how many claims it now runs through its artificial intelligence. In CCC's own Crash Course presentation published April 8, 2024, CCC stated that "through 2023 CCC processed more than 19 million claims using one of our AI solutions."

53. CCC's own risk disclosures describe the aggregation of consumer data across its customers. CCC's fiscal year 2025 Form 10-K states that "a limited number of our solutions collect, use, disclose, or otherwise process transaction-level data aggregated across our customers," and that "We anticipate that over time we will expand our use and collection of personal information as greater amounts of such personal information may be transferred from our customers to us."

54. CCC develops and licenses products, analytics, and artificial-intelligence models built on data aggregated across its network to its other customers: the Insurer MSA provides that Customer Data "will be used in a cross-carrier database regardless of whether Customer orders or uses any CCC anti-fraud product" (Section 7(c)(v)), contemplates the "development or testing of artificial intelligence tools or models using Customer Data which has not been De-identified" (Section 7(d)), and provides that "CCC may use data to train AI Services" (Section 13(c)); and CCC reports that it "has



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

developed more than 400 AI models, some of which are in use across more than 125 insurers, and more than 15,000 repair facilities."

55. Section 8(c) of the Repair Facility License Agreement, under which collision repair facilities enter consumers' Personal Information into CCC ONE, reserves to CCC the use of the data the facility supplies "for any internal industry, market, and trend analysis, product improvement, and research and development by, or on behalf of, CCC and its affiliates" (¶ 31). Unlike Section 8(d), which limits CCC's use of that data "within CCC's and its affiliates' products and services" to "de-identified form," Section 8(c) contains no de-identification condition. Plaintiffs allege CCC's internal retention and use of their Personal Information on information and belief because those facts are peculiarly within CCC's possession and control, and that belief rests on CCC's own contracts (¶¶ 31, 37-41), its securities filings (¶¶ 50-53), its public statements (¶¶ 48-49, 52), its patents (¶¶ 62-67), and its written confirmation to a consumer that it holds a repair record retrievable by the consumer's identity (¶¶ 84-85).

56. CCC has expanded its artificial-intelligence business by acquisition. On January 6, 2025, CCC completed its acquisition of EvolutionIQ, "a privately held company that provides AI-powered guidance for disability and injury claims management," for total consideration of $674.3 million, to "broaden the Company's portfolio of AI-based solutions available to insurance customers." CCC attributed four percent of its fiscal year 2025 revenue growth to that acquisition. The acquisition is alleged to show the breadth of CCC's artificial-intelligence business.

57. CCC's own descriptions confirm that its claims-guidance artificial intelligence operates on claims data about individuals. CCC's fiscal year 2025 Form 10-K states that

its claims-guidance solutions "use AI to help claims examiners identify the best next action on every claim at the right time" by "updating all claims data, structured and unstructured, and alerting examiners when a particular case needs attention."

58. The consumers whose Personal Information populates CCC ONE receive none of this value and are told nothing of it. On information and belief, CCC derives revenue and competitive advantage from those artificial-intelligence products and analytics that are built using Personal Information that collision repair facilities entered into CCC ONE in connection with Class Members' repairs, and Class Members receive no compensation and no notice that their Personal Information is put to this use.

59. CCC's revenue grew from $688.3 million in fiscal year 2021 to $1,057.0 million in fiscal year 2025.

60. The measure of CCC's unjust enrichment is the value CCC derived from the secondary use of Class Members' repair and claim data, that is, CCC's use of that data beyond preparing or transmitting the estimate, and that measure excludes revenue attributable to the EvolutionIQ acquisition.

61. Whether the Personal Information CCC uses to build and train its products is first de-identified is a question answerable only from CCC's own records. CCC's form contracts permit de-identification but do not require it before every use: the Insurer MSA contemplates the "development or testing of artificial intelligence tools or models using Customer Data which has not been De-identified," subject only to the insurer's prior written approval (Section 7(d)), and provides without any de-identification condition that "CCC may use data to train AI Services" (Section 13(c)). Neither provision calls for notice to, or consent from, the consumer, and no version of CCC's FY2021 through

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

FY2025 10-Ks states that CCC anonymizes or de-identifies the personal information or transaction-level data that CCC uses to build and train its products. CCC's appropriation of each consumer's identifiable Personal Information into CCC's own historical data assets, which CCC holds for and exploits in its own business beyond the consumer's own repair and claim (¶¶ 50-54), is itself an intrusion, and each later aggregation and use of that Personal Information is a further intrusion. Any de-identification CCC applies afterward neither gives the consumer notice nor undoes CCC's appropriation of the identifiable record.

**D. CCC's Patents Describe Training Artificial-Intelligence Models on Identifiable Consumer Data**

62. The patents issued to CCC Inc. under its former name, CCC Information Services Inc., describe, in applications to the United States Patent and Trademark Office, the designs and capabilities of systems built to collect, store, train on, and reuse identifiable consumer and vehicle data. The paragraphs that follow describe those designs.

63. United States Patent No. 10,922,726 (the "'726 Patent"), titled "Intelligent vehicle repair estimation system," issued to CCC Information Services Inc. on February 16, 2021, describes the historical data that CCC's system uses "to generate and train the parts prediction model," and states that this historical data "may include" the following:

> insurance policy number; insurance company or carrier holding the insurance policy; identification of insured party; vehicle owner name, street, city and state address, zip code; location (e.g., state and zip code) where vehicle loss or incident occurred; zip code where vehicle is garaged/stored; vehicle driver name, age, street, city and state address, zip code; Vehicle Identification Number (VIN); vehicle make, model, model year, country of origin, manufacturer; vehicle





Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

> type or body style (e.g., sedan, coupe, pick-up, SUV, wagon, van, hatchback, convertible, etc.); vehicle odometer reading; vehicle engine size, color, number of doors; vehicle ownership status (e.g., leased, owned outright, short term rental, etc.); age of vehicle; condition of vehicle; settlement amount between insurance company and repair facility; payout amount (if any) to insured party or party holding the insurance policy; loss or incident date; weather or road conditions at time or location of loss//incident/accident; vehicle appraisal inspection location and responsible adjustor; points of impact; vehicle drivable condition; airbag deploy condition; qualitative severity of damage; quantitative severity of damage; velocity of vehicle just prior to impact(s); change in velocity of vehicle due to impact(s); vehicle dimension score; vehicle repair score; initial estimate; estimate or prediction of settlement at FNOL (First Notice of Loss); estimate from another repair facility or party; one or more additional estimates and indications of when during the claim settlement process the additional estimates occurred; occurrence of one or more re-inspections; cost to perform each re-inspection; revised estimate after re-inspection and corresponding repair work/parts; occurrence of one or more supplements paid from insurance company to repair facility; monetary amount of each supplement; level of desired target quality of repair; level of actual quality of repair; deductible; towing and storage costs; labor hours and costs for replacement and/or repair; type of labor (e.g., sheet metal, mechanical, refinish, frame, paint, structural, diagnostic, electrical, glass, etc.); type of part (e.g., OEM (Original Equipment Manufactured), new, recycled, reconditioned, aftermarket, etc.); individual identifier of part; cost of part; paint costs; tire costs; hazardous waste disposal costs; other disposal costs; repair facility name, location, state, zip code; drivability indicator; and/or other data related to damage to vehicles and corresponding repairs.

64. The '726 Patent also describes tagging vehicle images, before the system ingests them, with metadata that includes the vehicle's license plate, the insurance claim policy number, and the VIN. It describes retraining the parts-prediction model periodically, "such as weekly, monthly or quarterly," or when a quantity of new data has been added. The only deletion before training that the patent describes is limited to



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

discontinued parts and to the makes, models, and years of vehicles less likely to be on the road; the patent does not describe deleting consumers' Personal Information.

65. United States Patent No. 11,727,551, titled "Image processing system using recurrent neural networks," issued to CCC Information Services Inc. on August 15, 2023, describes obtaining images of a damaged vehicle directly from consumers and feeding the system's live, per-claim decisions back into its training database, stating that "current decisions may be added to the database to use," producing an ever-larger set of training data.

66. United States Patent No. 9,500,545, titled "Methods and apparatus for using black box data to analyze vehicular accidents," issued to CCC Information Services Inc. on November 22, 2016, describes harvesting event-data-recorder information from vehicles and states that harvesting "does not erase the information in the data storage module," so that "the same 'black box' information related to an accident event can be harvested multiple times by parties with different interests," a group that the patent says includes insurance company personnel, independent adjusters and appraisers, and auto repair facility personnel.

67. Taken together, these patents describe CCC's designs for systems that ingest, store, retrain on, and reuse identifiable consumer and vehicle data of the kinds that populate CCC ONE, including names, home addresses, VINs, license plates, policy and claim identifiers, and event-data-recorder data. On information and belief, CCC has implemented these designs in the CCC ONE platform and in the artificial-intelligence products and analytics it licenses to insurers and other customers.

**E. CCC Gives Consumers No Notice That It Keeps, Aggregates, and Commercially Uses Their Personal Information**

68. A consumer whose vehicle is damaged takes the vehicle, or has it taken, to a collision repair facility and leaves it there for repair. The repair facility, not the consumer, has the relationship with CCC, and the repair facility enters the consumer's Personal Information into CCC ONE. The consumer generally does not know that CCC is involved and often never sees the CCC ONE estimate. CCC's name appears on the estimate only in a legend attributing the estimating software to CCC: the legend on the estimates prepared for Plaintiffs Burries and Garcia reads "CCC ONE Estimating - A product of CCC Intelligent Solutions Inc.," and the legend on the January 2024 estimate prepared for Plaintiff Saturné reads "CCC ONE Estimating - A product of CCC Intelligent Services Inc." (¶¶ 14-16). The appearance of CCC's name in that legend does not mean that the consumer saw it or knew of CCC's involvement. Across every page of such an estimate, including the page captioned for insurance-company disclosures and customer notifications and the abbreviations and legend pages, no language describes CCC's collection, retention, aggregation, sharing, licensing, or artificial-intelligence and analytics use of the consumer's Personal Information, and the only privacy-related notices are the anti-fraud and non-original-parts warnings required of insurers and repair facilities. The legend tells a consumer who sees it only that CCC supplies the estimating software, and it gives the consumer no notice that CCC retains, aggregates across its network, or commercially uses the Personal Information entered into CCC ONE.

69. California has declared it the public policy of the State that a business controlling the collection of a consumer's Personal Information, including where the



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

collection occurs in a vehicle, inform the consumer, at or before the point of collection, of the categories of Personal Information collected and the purposes for which that Personal Information will be used. *See* Cal. Civ. Code § 1798.100(b).

70. CCC does publish a privacy policy, but it posts that policy only on CCC's own website. A consumer dealing with the repair facility and the insurer, and not with CCC, has no occasion to visit CCC's website, and even a consumer who located and read the policy would find nothing in it that would inform the consumer of the practice this Complaint challenges.

71. The version of CCC's privacy policy last updated April 7, 2020 was addressed to visitors to CCC's website, bound those visitors to its terms merely by their visiting or using the website, did not state that it covered information CCC received from repair facilities or insurers in a service-provider capacity, and contained no California service-provider carve-out.

72. That April 7, 2020 policy nonetheless reserved broad secondary use of aggregated data, stating that CCC "may use and disclose aggregate information without restrictions and for a broad range of purposes," including "[t]o develop and publish industry research and reports".

73. The version of CCC's privacy policy effective January 4, 2023 contained the same service-provider carve-out, the same "de-identified or aggregated data for any purpose" language, and the same categories of Personal Information as the current version described below.

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

74. CCC's current website privacy policy, last updated September 29, 2026, acknowledges that CCC receives Personal Information about consumers from repair facilities and insurance companies (¶ 25).

75. The same policy reserves to CCC the unrestricted right to use and to share de-identified and aggregated data, stating that CCC "may use de-identified or aggregated data for any purpose, unless prohibited by law."

76. The current policy further states that CCC may combine information it collects online with offline information, may combine information from other parties with information CCC already holds, and may aggregate a consumer's information with other users' information to understand preferences and trends over time. The current policy states that CCC retains information "for as long as it is reasonably needed or permitted considering the purposes for which we collected it," and it discloses no fixed retention period and no deletion schedule.

77. No version of CCC's website privacy policy in effect from April 2020 through September 2026 mentions artificial intelligence, machine learning, or model training in connection with how CCC uses or shares Personal Information or de-identified and aggregated data.

78. CCC's separate CCC ONE Total Repair Platform Data Policy, last updated 2022, like the website privacy policy, contains no mention of artificial intelligence, machine learning, or model training.

79. The one setting in which CCC presents its own terms directly to a consumer is CCC's Quick Estimate application, which a consumer reaches through a link an insurer sends by text message or email and which requires the consumer to accept CCC's Terms

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

of Use and Privacy Policy before signing in, by acknowledging "that I have read and agreed to CCC Mobile Solutions - Quick Estimate Terms of Use and Privacy Policy". CCC's separate Quick Estimate Privacy Policy contains no mention of artificial intelligence, machine learning, or model training in connection with the consumer data it addresses.

80. A consumer who accepts CCC's Quick Estimate terms agrees, as a condition of using the application, to an arbitration provision and to a waiver of the right to proceed in a class or representative action. As the Class definition set forth in the Class Action Allegations section reflects, the Class and Subclasses exclude every individual who, in connection with the estimate or claim at issue, accepted terms of use or an end-user agreement presented by CCC. This action concerns only the consumers whom CCC never asked to agree to anything.

81. A consumer whose Personal Information is entered into CCC ONE by a repair facility or by an insurer in connection with an estimate or claim never deals with CCC directly, and CCC never asks that consumer to agree to any terms or to consent to CCC's retention, aggregation, or commercial use of the Personal Information.

**F. When Consumers Ask, CCC Calls Itself a "Service Provider" and Refuses to Act**

82. For the Personal Information at issue in this action, CCC's current policy directs the consumer away from CCC, stating that California consumer rights "may not apply to personal information collected by CCC as a service provider on behalf of our customers or clients, such as insurance companies or repair shops." The policy then instructs the consumer to "contact that third party regarding your privacy rights."

83. CCC applies that policy to turn consumers away even when CCC holds their records. On September 2, 2025, a consumer whose vehicle had been repaired at a collision repair facility wrote to CCC's published privacy address and asked for "access to the personal information your company has collected, stored, or shared about me," identifying himself by name and date of birth. When the request went unanswered, the consumer followed up and then called CCC, and was referred to a CCC regional business manager, who described herself as "the sales manager for southern California" and asked the consumer for "[t]he name of your shop" and "[y]our CCC license #." The consumer explained that he was not a shop owner but a consumer whose information had been entered through CCC ONE.

84. CCC's privacy team then confirmed that CCC holds a repair record retrievable by the consumer's identity, and refused to give the consumer any of it. On September 30, 2025, CCC wrote that it could not find "any personal data collected directly from you with this email address," but that "[t]here is one record of a repair with a shop and there may also be data associated with an insurance claim." CCC continued: "Because this data was provided to us in our capacity as a service provider/processor, we cannot take any action. You must submit a request to the repair facility, insurance carrier, or other business you believe has collected your personal data. If they approve your request, they will submit the request to us on your behalf."

85. When the consumer renewed the request, CCC identified the repair facility and the insurer by name and repeated, on October 17, 2025, that "[b]ecause this data was provided to us in our capacity as a service provider, we cannot take any action." CCC thus maintains consumers' repair and claim records in a form it can locate by the



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

consumer's identity, yet gives the consumer no means to learn from CCC what CCC holds, what CCC has done with it, or to whom CCC has disclosed it, except through the permission of the very businesses that supplied the data to CCC.

86. CCC's description of itself as a "Processor" in the DPA, and as a "service provider" acting "on behalf of our customers or clients, such as insurance companies or repair shops" in its website privacy policy, cannot be reconciled with the cross-customer uses that CCC's own agreements authorize (¶¶ 31, 37-41).

87. Under the regulations implementing the California Consumer Privacy Act that govern service providers (the "Service-Provider Regulation"), a service provider may use the personal information it processes to build or improve its services only for its own internal use, and may not use the personal information it processes on behalf of one business to perform services on behalf of another person. *See* Cal. Code Regs. tit. 11, § 7050(a)(3).

88. CCC's use of consumers' Personal Information to build products and models that CCC then licenses to other customers (¶ 54) exceeds the internal-use limit that defines a service provider under the Service-Provider Regulation.

**G. CCC Knew That Its Practices Implicate Consumer Privacy**

89. CCC's 10-Ks identify the California Consumer Privacy Act, the California Privacy Rights Act, the General Data Protection Regulation, and the Fair Credit Reporting Act as data-privacy regimes that CCC identifies as relevant to its processing of personal information, under a risk-factor heading warning that "[f]ailure to comply with data privacy laws and regulations could subject us to fines, sanctions or litigation, and

could potentially damage our brand and reputation and adversely impact our business, results of operations or financial condition."

90. CCC repeated the same California Consumer Privacy Act and Fair Credit Reporting Act risk-factor disclosures, substantively unchanged, across its FY2021, FY2022, FY2023, and FY2025 10-Ks, even as CCC's customer base, transaction volume, and the amount of data it processed expanded over those years.

91. In the same risk factor, CCC acknowledged that it collects, uses, discloses, or otherwise processes personal information, including transaction-level data aggregated across its customers (¶ 53), and that it "recognize[s] that personal privacy has become a significant issue in the U.S., and other jurisdictions where we operate." CCC has made that acknowledgment to investors since its August 27, 2021 Form S-1 registration statement.

92. CCC further acknowledged that the Fair Credit Reporting Act "may in the future limit how we use consumer information." CCC stated that "[a]lthough we do not believe we are currently subject to the FCRA, we may be in the future, depending on changes to our solutions and services or on additional legislative or regulatory efforts that could further regulate credit reporting agencies and the collection, use, communication, access, accuracy, obsolescence, sharing, correction and security of such personal information."

93. While CCC told its investors that personal privacy is a significant issue and that it aggregates transaction-level data across customers, CCC gave consumers no corresponding notice (¶¶ 68-81).

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

**H. Consumers Did Not and Could Not Consent, and Cannot Avoid CCC**

94. California public policy recognizes that valid consent to the processing of a consumer's Personal Information must be freely given, specific, informed, and unambiguous. *See* Cal. Civ. Code § 1798.140(h). A consumer who was not informed that CCC retained the consumer's Personal Information, aggregated it across CCC's network, and used it to build and license commercial products could not, and did not, consent to that practice. Because CCC built its platform so that its retention, aggregation, and commercial use of the consumer's Personal Information are invisible to consumers, the absence of consent is common to every Class Member.

95. CCC's platform is embedded across the standard workflows of the collision-repair and automobile-insurance industries (¶¶ 23-24), and repair facilities and insurers supply the consumer's Personal Information to CCC in the ordinary course of preparing an estimate and adjusting a claim.

96. As a practical matter, a consumer whose vehicle is damaged in a collision and who must restore the vehicle to service engages a repair facility and, ordinarily, an insurer, yet before selecting that facility or using insurance benefits the consumer cannot learn whether that facility or that insurer routes the consumer's Personal Information to CCC, because the estimate prepared with the consumer's Personal Information does not identify CCC as a recipient, retainer, or user of the data for any purpose beyond preparing the estimate. CCC's only consumer-facing statement of its practices is the privacy policy on CCC's website, which says nothing of those uses and routes consumers back to the insurer or repair shop (¶¶ 70-77, 82).

97. Because CCC's platform is embedded across these industry-standard workflows, and because no practical alternative is ordinarily available to a consumer who needs a vehicle repaired, consumers are, as a practical matter, effectively required to furnish their Personal Information to CCC as a condition of obtaining necessary repair and claim services, a circumstance common to every Class Member.

**I. CCC's Operations in China**

98. CCC operates in China through CCCIS Cayman Holdings Limited ("CCC Cayman"), a majority-owned subsidiary that is the parent of CCC's China subsidiaries, and a third-party investor holds Series A Preferred Stock in CCC Cayman under a stock purchase agreement dated March 12, 2020.

99. CCC provides insurance claims software to automotive insurers in China, and CCC's FY2021 10-K states that "CCC provides insurance claims software in China, with four of the top five automotive insurers in China using our platform." CCC's FY2025 10-K softens that language to a reference to some of the largest automotive insurers in China.

100. CCC's international solutions in China represented approximately one percent of total revenue in fiscal years 2023 and 2025, and CCC recorded a fiscal year 2023 impairment charge of $5.3 million against the China reporting unit's customer-relationship and acquired-technology intangible assets because the expected China cash flows did not support the carrying amounts.

101. CCC's 10-Ks disclose that CCC intends to expand its business operations in China, stating that CCC's "business, prospects, financial condition and results of





Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

operations may be affected to a significant degree by political, economic and social conditions in China generally."

102. This Complaint does not allege that CCC processes Class Members' Personal Information in China. To the extent discovery establishes that Personal Information stored on CCC's servers in identifiable form is accessible through CCC's majority-owned China subsidiaries, that access bears on the scope of CCC's use of Class Members' Personal Information.

## TOLLING OF STATUTES OF LIMITATIONS

103. The statutes of limitations applicable to the claims of Plaintiffs and the Class are subject to delayed accrual under the discovery rule and to continuous accrual, as set forth below, and the grounds for delayed accrual are common to the Class.

104. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, that CCC retained, aggregated across its network, and used their Personal Information to build and license commercial products. The CCC ONE estimate prepared for each Plaintiff's vehicle (¶¶ 14-16) identified CCC only as the maker of the estimating software and said nothing about CCC's retention, aggregation, or use of her Personal Information (¶ 68). CCC gave consumers no notice of that practice at any place a consumer would encounter it, neither on the CCC ONE estimate nor in the privacy policy on CCC's website, no version of which in effect from April 2020 through September 2026 mentions artificial intelligence or model training (¶ 77). Each Plaintiff first learned of CCC's practice in September 2026, through consultation with counsel. Before then, no Plaintiff had received any communication from CCC or had any reason to suspect that the

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

software company named in the estimate footer kept or used her Personal Information for its own purposes.

105. CCC's retention and use of each Plaintiff's Personal Information did not end when their estimate was prepared. On information and belief, CCC continues to hold each Plaintiff's Personal Information in identifiable form in its historical data assets (¶¶ 50, 84-85), and CCC's systems are designed to retrain on accumulated data periodically, "such as weekly, monthly or quarterly" (¶ 64), and to add current decisions to their training data (¶ 65). Each retention, aggregation, and use of a Plaintiff's Personal Information for CCC's own commercial purposes is a separate invasion of their privacy and a separate receipt of benefit by CCC, and each gives rise to a claim that accrues when it occurs.

106. The sources in which CCC does describe its aggregation of transaction-level data across customers and its development of artificial-intelligence products are directed to investors and to the patent office, not to consumers: CCC's securities filings, which tell investors that a limited number of CCC's solutions aggregate transaction-level data across customers and that CCC anticipates expanding its use and collection of personal information over time, and CCC's patents, which describe for the United States Patent and Trademark Office the designs by which consumer and vehicle data are ingested and used to train CCC's models. A consumer exercising reasonable diligence, including reading the repair estimate and the insurance paperwork, would not be led from those investor-facing and patent-facing sources to the practice this Complaint challenges.

107. The facts establishing CCC's retention, cross-network aggregation, and commercial use of Personal Information lay within CCC's own systems, within CCC's



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

form license agreements with repair facilities and insurers, and within CCC's internal practices, to which Plaintiffs and the Class had no access. Plaintiffs acted reasonably and in good faith, and they filed this action promptly after learning of CCC's practice in September 2026.

108. Because CCC designed its platform so that its retention, aggregation, and commercial use of Personal Information are invisible to consumers, applicable to every Class Member alike, the facts giving rise to delayed discovery are the same for each Class Member. The discovery rule therefore applies in common to the Class, and it tolls the applicable limitations periods for each claim asserted in this Complaint throughout the Class Period, which runs from four years before the filing of this Complaint through the date of class certification.

## CLASS ACTION ALLEGATIONS

109. Plaintiffs bring this action on their own behalf and on behalf of the Class and the Subclasses defined below, and contend that this suit is properly maintainable as a class action under Federal Rule of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4).

### A. Definition of the Class and the Subclasses

110. Plaintiffs seek to represent the following nationwide class (the "Nationwide Class" or the "Class"):

> All natural persons in the United States who meet each of the following criteria: (a) a collision repair facility located in the United States prepared an estimate for the repair of a vehicle using the CCC ONE platform; (b) the person is identified on that estimate as the owner of the vehicle or as the repair facility's customer; and (c) the estimate was prepared during the Class Period.



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

111. Plaintiffs seek to represent the following Nationwide Intrusion Subclass for purposes of Count I:

> Nationwide Class members whose estimate was prepared by a collision repair facility located in the District of Columbia or in any State other than New York, Virginia, and North Dakota.

112. Plaintiffs seek to represent the following California Subclass:

> Nationwide Class members whose repair estimate was prepared by a collision repair facility located in California.

113. The "Class Period" is the period from four years before the filing of this Complaint through the date of class certification. Members of the Class are referred to as "Class Members," and the Nationwide Intrusion Subclass and the California Subclass are referred to together as the "Subclasses."

114. Excluded from the Class and each Subclass are the following: CCC and its parents, subsidiaries, affiliates, and controlled entities, and their officers, directors, and employees; any individual who, in connection with the estimate at issue, accepted terms of use or an end-user agreement presented by CCC (including through Quick Estimate or other CCC-hosted consumer applications or websites); the judicial officers assigned to this case and their immediate family members; and Class counsel.

115. Plaintiffs reserve the right to amend, modify, or refine the definitions of the Class and the Subclasses, including the Class Period, and to add or divide subclasses, as discovery into CCC's records proceeds and as warranted.

**B. Numerosity and Ascertainability**

116. The Class and each Subclass are so numerous that joinder of all members is impracticable. Based on the volume of transactions CCC reports processing through its

platform, the Nationwide Class comprises, on information and belief, at least 15 million individuals, and likely tens of millions; the Nationwide Intrusion Subclass, which includes every Nationwide Class member whose estimate was prepared in the District of Columbia or in a State other than New York, Virginia, and North Dakota, comprises the large majority of them; and the California Subclass comprises millions of individuals.

117. This estimate is a reasonable inference from CCC's own disclosures concerning the scale of its platform. In its Form 10-K for fiscal year 2025, CCC states that it processes more than $200 billion of transactions annually for its more than 35,000 customers. CCC states that it has customer agreements with more than 300 insurers and more than 30,500 automotive collision repair facilities. CCC states that its platform operates with over 888,000 registered users and 5.7 billion database transactions processed per day. CCC states that it has processed more than $2 trillion of historical data across its network. CCC has also stated its volume directly: in December 2018, when its network included more than 24,000 repair facilities, CCC announced that "over 24 million estimates and 16 million repairs" are processed on CCC's products and services each year. Because each repair estimate that a collision repair facility prepares through CCC ONE corresponds to an individual identified on the estimate as the owner or customer whose Personal Information is entered into the platform, four years of repairs at CCC's 2018 volume, on a network of repair facilities that has since grown by more than 25 percent, identify, on information and belief, at least 15 million individuals even allowing for consumers who had more than one vehicle repaired. The number of Class Members whose Personal Information CCC received and stored during the Class Period is therefore, on information and belief, at least 15 million, and likely tens of millions,



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

nationally and, given California's share of the national vehicle and insurance market, in the millions in California.

118. The Class Members are ascertainable from CCC's own records by objective criteria. CCC ONE is a CCC-hosted repair-management, estimating, and appraisal platform on which, on information and belief, CCC stores the estimate records entered by collision repair facilities, including the identity and location of the facility that prepared each estimate. CCC receives information about consumers directly from insurance carriers and repair facilities. Each estimate record contains, among other things, the vehicle owner's name, home address, telephone number, vehicle identification number, license plate, claim number, and mileage, as the CCC ONE estimate generated for Plaintiff Burries reflects. CCC has itself located a consumer's repair record, and identified the repair facility and insurer associated with it, from the identifying information the consumer supplied in a written request (¶¶ 83-85). Class Members therefore can be identified from CCC's transaction records without resort to member-by-member fact finding.

## C. Common Questions of Law and Fact

119. Questions of law and fact common to the Class are capable of resolution on a classwide basis. Every Class Member's Personal Information entered CCC ONE through the same channel, a collision repair facility's CCC ONE estimate, and CCC's practices of receiving and storing that Personal Information are uniform across the Class. Whether CCC then aggregated and used that Personal Information for a commercial purpose beyond preparing or transmitting the estimate, and the measure of any resulting

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

enrichment, present questions common to the Class, and each common question can be answered for every Class Member with common proof drawn from CCC's own records.

120. The common questions include the following:

(a) whether CCC received Class Members' Personal Information entered into CCC ONE by collision repair facilities, and stored it on CCC's servers in identifiable form;

(b) whether CCC gave Class Members any notice that it would retain, aggregate, or use their Personal Information for any purpose beyond preparing or transmitting the estimate or claim;

(c) whether a collision repair facility's contractual grant of rights to CCC constitutes the consent of the consumer whose Personal Information the facility entered into CCC ONE;

(d) whether CCC used Class Members' Personal Information for a commercial purpose beyond preparing or transmitting the estimate;

(e) whether CCC's receipt, storage, and use of Class Members' Personal Information, without notice, would be highly offensive to a reasonable person;

(f) whether Class Members retained a reasonable expectation of privacy in the Personal Information entered into CCC ONE;

(g) whether CCC's conduct constitutes a serious invasion of the right to privacy guaranteed by Article I, Section 1 of the California Constitution, as to the California Subclass;

(h) whether CCC was enriched by its receipt, storage, and use of Class Members' Personal Information, and the classwide measure of that enrichment;

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

(i) whether CCC's conduct constitutes an unlawful or unfair business practice under the California Unfair Competition Law, as to the California Subclass;

(j) whether the discovery rule and continuous accrual apply to the claims of the Class; and

(k) whether Plaintiffs and the Class are entitled to injunctive and declaratory relief.

**D. Typicality**

121. Plaintiffs' claims are typical of the claims of the Class. Each Plaintiff's Personal Information was entered into CCC ONE by a collision repair facility on a CCC ONE estimate that identifies them as the owner of the vehicle, contains, among other things, their name, home address, telephone number, vehicle identification number, license plate, and mileage, and bears a CCC Data Date distinct from the date the facility generated it (¶¶ 13-16, 28). On information and belief, that Personal Information was transmitted to and stored on CCC's servers in identifiable form. Plaintiffs' three estimates were prepared by three different repair facilities, two under an adverse carrier's claim and one with no insurance company or claim identified. Because every Class Member's Personal Information entered CCC ONE the same way, through a collision repair facility's CCC ONE estimate, and because CCC's practices of receiving and storing that Personal Information do not vary with the state in which the facility is located, Plaintiffs' claims are typical of the claims of the Class in every state, and each named Plaintiff and each Class Member was subjected to the same receipt and storage practices.

**E. Adequacy of Representation**

122. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the other

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Class Members, because Plaintiffs and every Class Member share the same interest in establishing CCC's uniform practices of receiving and storing Personal Information entered into CCC ONE without notice to the individuals it concerns. Plaintiffs have retained counsel experienced in complex class actions, who will prosecute this action vigorously on behalf of the Class.

**F. Predominance and Superiority**

123. Questions of law and fact common to the Class predominate over any questions affecting only individual Class Members. CCC's liability turns on conduct that is uniform across the Class and provable from CCC's own records: whether CCC gave notice that it would retain and use Personal Information beyond the estimate or claim, and whether CCC in fact used that Personal Information for a commercial purpose beyond preparing or transmitting the estimate. The tort of intrusion upon seclusion is substantially uniform among the states that recognize it as formulated in Restatement (Second) of Torts § 652B (¶¶ 130-131). The Nationwide Intrusion Subclass is limited to the states that recognize the tort and excludes New York, Virginia, and North Dakota, so the law governing that subclass is materially uniform.

124. The measure of classwide recovery is defendant-side and is tied to the conduct challenged here: the value CCC derived from using Class Members' Personal Information beyond preparing or transmitting their estimates and claims, a value that can be computed on a classwide basis from CCC's own financial and transaction records. For the Nationwide Intrusion Subclass, Count I seeks disgorgement of that value to the extent the law governing each member's claim permits gain-based recovery. For the California Subclass, Count III seeks restitution of that same enrichment under California law. Any

recovery by a California Subclass member under Counts I and III will be without duplication.

125. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The recovery available to any one Class Member is small relative to the burden and expense of individual litigation against a defendant of CCC's size, so most Class Members have no realistic means to pursue relief on their own. Concentrating the claims in a single forum avoids inconsistent adjudications and conserves the resources of the parties and the Court. The action is manageable because liability and the measure of CCC's enrichment can be established with common proof drawn from CCC's own records.

**G. Notice to the Class**

126. Direct notice to the Class is practicable. CCC maintains, in its own transaction records, the names, home addresses, and contact information of the individuals whose Personal Information was entered into CCC ONE. Plaintiffs will seek to provide the best notice practicable under the circumstances, including individual notice to all Class Members who can be identified through reasonable effort, as required by Federal Rule of Civil Procedure 23(c)(2)(B). Direct notice by mail or electronic means, drawn from CCC's records, can be supplemented by published notice to reach any Class Members whose current contact information cannot be identified from those records.

**H. Rule 23(b)(2)**

127. Certification under Rule 23(b)(2) is appropriate because CCC has acted and refused to act on grounds that apply generally to the Class, so that final injunctive relief and corresponding declaratory relief are appropriate respecting the Class as a whole. The

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

injunctive and declaratory relief sought on behalf of the Nationwide Intrusion Subclass addresses CCC's uniform practices of receiving and storing Personal Information entered into CCC ONE without notice to the individuals it concerns.

**I. Rule 23(c)(4)**

128. In the alternative, and to the extent any question is found not to predominate, the Court may certify particular issues for classwide treatment under Rule 23(c)(4), including whether CCC used Class Members' Personal Information for a commercial purpose beyond preparing or transmitting the estimate, and the classwide measure of CCC's enrichment.

**COUNT I**
**INTRUSION UPON SECLUSION**
(Common Law; Restatement (Second) of Torts section 652B)
(On Behalf of the Nationwide Intrusion Subclass and the California Subclass)

129. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

130. Plaintiffs bring this Count on behalf of the Nationwide Intrusion Subclass and the California Subclass. The tort of intrusion upon seclusion is defined by the Restatement (Second) of Torts section 652B, under which one who intentionally intrudes "upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person" is subject to liability for invasion of privacy. Restatement (Second) of Torts § 652B (1977) (quoted in *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1216 (C.D. Cal. 2017)).

131. Each jurisdiction within the Nationwide Intrusion Subclass recognizes the tort of intrusion upon seclusion in substantially the form stated in the Restatement (Second)

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

of Torts section 652B, and each requires the same operative showing of an intentional intrusion into private affairs in a manner highly offensive to a reasonable person.

132. California common law recognizes the tort of intrusion upon seclusion, which requires an intentional intrusion into a matter as to which the plaintiff holds a reasonable expectation of privacy, occurring in a manner highly offensive to a reasonable person. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020).

133. A consumer who is involved in a collision and brings a vehicle to a collision repair facility, whether paying directly or through an insurance claim, expects the Personal Information supplied in that transaction to flow only among the visible participants in the repair: the consumer, the repair facility, and, where a claim is involved, the insurer. That data flow is closed and transaction specific, and CCC inserted itself into it as an undisclosed third party, routing each consumer's Personal Information through CCC's cloud-hosted CCC ONE platform, from which, on information and belief, it is transmitted to and stored on CCC's servers in identifiable form.

134. CCC receives the Personal Information in two capacities. In the first, CCC ONE operates as the repair facility's estimating tool, and CCC processes the Personal Information to prepare and transmit the consumer's estimate. In the second, CCC takes the same Personal Information for itself. Under its own form agreement with repair facilities, CCC reserves the right to use the data a facility supplies "for any internal industry, market, and trend analysis, product improvement, and research and development by, or on behalf of, CCC and its affiliates," a use that "may continue after the expiration or termination of this Agreement" (¶ 31), and CCC takes, together with insurers and CCC's vendor, "perpetual, royalty-free licenses to use the Content" (¶ 32).

CCC's form contract with insurers, to which CCC provides the repair Content under Section 29.10 (¶ 33), separately provides that "CCC may use data to train AI Services" (¶ 41). A consumer who gives Personal Information to a repair facility to obtain an estimate has no reason to expect that the facility's software vendor will acquire it in that second capacity, for the vendor's own products and for the benefit of the vendor's other customers. CCC's acquisition and retention of the Personal Information in identifiable form in that second capacity is unwanted access to data about the consumer, obtained by electronic means the consumer cannot see, and it is the intrusion alleged in this Count. CCC's later aggregation and commercial use of the Personal Information (¶¶ 140-142) show the purpose and character of that acquisition.

135. Plaintiffs and Subclass members held an objectively reasonable expectation of privacy in the Personal Information supplied during their repair and claim transactions. It is the record that a named person, at a stated home address and telephone number, was involved in a motor-vehicle collision; it identifies the vehicle by its identification number, license plate number, and mileage; where a claim is involved, it identifies the insurer, the claim number, the policy type, the insured, and the adjuster; and it describes the damage to the vehicle and the cost of its repair (¶¶ 1, 14-16, 27). That Personal Information is not publicly available, arose from private incidents in consumers' lives, and was supplied for the limited purpose of obtaining a repair or resolving a claim.

136. CCC obtained no consent from Plaintiffs or Subclass members. In the Repair Facility License Agreement (¶¶ 31-32), the repair facility "grants CCC full right and authority to use data supplied by" the facility (§ 8), and a further provision grants CCC, insurers, and CCC's vendor "perpetual, royalty-free licenses to use the Content,"

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

acknowledges that the Content "may contain nonpublic personal information," requires the facility to warrant its own authority to grant those licenses, and requires the facility to indemnify CCC "for failure to obtain the requisite authorizations" (§ 29.10). Plaintiffs and Subclass members were never parties to that agreement, never signed it, and never authorized any facility to supply their Personal Information to CCC for CCC's own use; the facility's contractual grant is not the consent of the consumer whose Personal Information the facility supplied, and as to Plaintiffs and Subclass members CCC is a stranger to that agreement.

137. The Appraiser License Agreement and the Insurer MSA likewise run only between CCC and its business customers, and the data-use, license, and artificial-intelligence training grants they contain (¶¶ 35-41) reflect no agreement by the consumer whose Personal Information is at issue.

138. CCC designed the CCC ONE platform to collect Personal Information from consumers without any consumer-facing disclosure of CCC's role in retaining, aggregating, or commercially using it, and CCC did not require repair facilities or insurers to inform consumers that CCC would receive, retain, or aggregate their Personal Information. Across all ten pages of the CCC ONE estimate generated for Plaintiff Burries's vehicle, including the dedicated insurance-disclosures-and-customer-notifications page, no notice, disclosure, or consent language described CCC's collection, retention, aggregation, sharing, licensing, or analytics use of the consumer's Personal Information, and the document offered no opt-out, access, or deletion right. CCC's fiscal year 2025 Form 10-K confirms that this design reflects CCC's own business strategy rather than an incidental byproduct of operating the platform, because CCC states there



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

that it anticipates expanding its use and collection of personal information as greater amounts of personal information may be transferred from its customers to CCC (¶ 53).

139. CCC acquired the Personal Information of consumers who had no interaction with CCC and whose repair and claim transactions gave them no notice of CCC's role. Plaintiffs and Subclass members never used any service of CCC (¶¶ 14-16, 81). The only text in the repair transaction that named CCC was a product footer attributing the CCC ONE Estimating product to CCC, which gave the consumer no notice that CCC would retain, aggregate, or commercially use the consumer's Personal Information (¶ 68). CCC's website privacy policy, which since January 2023 has described CCC as a "service provider" for consumer information collected by repair facilities and insurers, in no version in effect from April 2020 through September 2026 discloses any use of artificial intelligence or model training (¶¶ 70-77). CCC knows that the consumers whose Personal Information it receives never dealt with CCC and never authorized CCC's use of it: CCC requires each repair facility to warrant its own authority and to indemnify CCC "for failure to obtain the requisite authorizations" (¶ 136), and when a consumer asked CCC directly for the personal information it held about him, CCC located his repair record and responded that, because the data was provided to CCC "in our capacity as a service provider/processor, we cannot take any action" (¶¶ 83-85). CCC also knows that the Personal Information concerns consumers who have not authorized CCC's own use of it. CCC's form contract with insurers recognizes that the data it receives is identifiable to "insureds or third-party claimants" (¶ 37). CCC describes itself as a "Processor" and a "service provider" while reserving to itself uses for its other customers (¶¶ 43, 86-88), under a privacy statute that CCC identifies as relevant to its processing (¶ 89). And CCC



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

forbids its own customers to compile the same estimate data into a database while reserving that use to itself (¶¶ 34-36). CCC wrote the terms under which it takes the data.

140. The scope of CCC's intrusion aggravates its offensiveness, because CCC does not merely hold a single estimate. As CCC's own securities filings acknowledge (¶¶ 23, 50-51, 53), CCC aggregates transaction-level data across a national network of insurers and collision repair facilities into a centralized repository. On information and belief, CCC links those records to one another by, among other things, the consumer's name, home address, vehicle identification number, and license plate number, and the linked records show which consumers have been in collisions, how often, with what damage, under which insurers' claims, and at what cost of repair, a history that no single repair facility or insurer holds and that no single repair transaction would reveal (¶¶ 50, 53, 63-64).

141. On information and belief, CCC used the aggregated Personal Information collected through CCC ONE to develop and train the commercial artificial-intelligence products that CCC licenses to other insurers and customers, a secondary use untethered to the preparation or transmission of any repair estimate. Those models are in use across a large base of insurers and repair facilities (¶¶ 23, 51, 54). The use of a person's Personal Information as a revenue-generating commodity, without the person's knowledge or permission, offends reasonable expectations of privacy.

142. CCC's retention, aggregation, and secondary commercial use of Personal Information in identifiable form were not necessary to prepare or transmit a repair estimate and show that CCC acquired the Personal Information for its own purposes, and CCC's own form contracts confirm that a de-identified alternative was available to it. The



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Repair Facility License Agreement authorizes CCC to use supplied data "in de-identified form, within CCC's and its affiliates' products and services" (§ 8(d)); the Insurer MSA permits research and development "provided that all Customer Data is De-identified" and permits inclusion of Customer Data within CCC's products "in De-identified form" (§ 7(c)); and the DPA permits CCC to process aggregate and de-identified data "for any purpose" (§ 2(b)). On information and belief, CCC nonetheless ingested and retained consumers' Personal Information in identifiable form, including, among other things, names, home addresses, and license plate numbers, and the Insurer MSA separately contemplates the "development or testing of artificial intelligence tools or models using Customer Data which has not been De-identified" (§ 7(d)).

143. As a direct and proximate result of CCC's intrusion, Plaintiffs and Subclass members lost their right to seclusion in their Personal Information, lost control over the dissemination and use of that Personal Information, were deprived of the economic value of Personal Information that CCC exploited for its own profit, and suffered dignitary harm from the use of their private information as a commodity without their knowledge. Plaintiffs Burries, Garcia, and Saturné each suffered these injuries, because their Personal Information entered CCC ONE through the estimates described in paragraphs 13 through 16 and, on information and belief, was transmitted to and stored on CCC's servers in identifiable form.

144. CCC acted with malice and oppression within the meaning of California Civil Code section 3294. In its filings with the United States Securities and Exchange Commission, CCC acknowledged that "personal privacy has become a significant issue" and that it "anticipate[s] that over time we will expand our use and collection of personal

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

information," and CCC continued to collect and commercially exploit consumers' Personal Information without notice or consent. On information and belief, officers, directors, or managing agents of CCC had advance knowledge of these practices and allowed them to continue without curtailment, as reflected in the recurring privacy risk disclosures that CCC Holdings repeated across consecutive annual reports. CCC's retention, aggregation, and secondary use of Personal Information are not the acts of an individual employee. They are the terms of CCC's own form agreements, which CCC uses across its network of repair facilities and insurers (¶¶ 30-43) and which reflect corporate policy set by CCC's officers, directors, or managing agents. CCC's privacy function applied that policy to a consumer's written request in September and October 2025, and CCC continued the practice after that request (¶¶ 83-85). CCC's conduct is despicable and has been carried on with a willful and conscious disregard of the privacy rights of consumers whom CCC knows have never agreed to CCC's own use of their Personal Information.

145. Plaintiffs and the California Subclass are entitled to nominal damages for the completed invasion of each member's legally protected privacy interest and to punitive damages under California Civil Code section 3294, and disgorgement of CCC's gains from the intrusion is sought for the California Subclass through Count III, without duplication. Members of the Nationwide Intrusion Subclass whose transactions occurred outside California are entitled to nominal damages for the completed invasion of each member's legally protected privacy interest, to disgorgement of the profits attributable to CCC's intrusion, and to punitive or exemplary damages, in each case to the extent the law governing the member's claim provides. Nominal damages neither measure nor reach the

gains CCC continues to derive from Personal Information it continues to retain, and Plaintiffs and the Subclasses lack an adequate remedy at law for those gains. Plaintiffs and the Subclasses are also entitled to injunctive relief prohibiting CCC from continuing to collect, retain, aggregate, and commercially exploit consumers' Personal Information without notice and consent. Plaintiffs reserve any individual compensatory damages arising from CCC's intrusion, including damages for emotional distress, for individual proceedings or for a Rule 23(c)(4) issue class.

**COUNT II**
**INVASION OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, SECTION 1**
(On Behalf of the California Subclass)

146. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

147. Article I, Section 1 of the California Constitution guarantees to all people the inalienable right of privacy, and it creates a right of action against private entities, and not only against governmental actors, whose conduct seriously invades that right. *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 20 (1994). Plaintiffs bring this claim on behalf of the California Subclass. Plaintiffs are members of the California Subclass, and references in this Count to the California Subclass and its members include Plaintiffs.

148. To establish a violation of the right of privacy under Article I, Section 1, a plaintiff must plead and prove a legally protected privacy interest, a reasonable expectation of privacy under the circumstances, and conduct by the defendant constituting a serious invasion of privacy. *Hill*, 7 Cal. 4th at 40.



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

149. California Subclass members hold a legally protected informational privacy interest in their Personal Information. The Personal Information at issue consists of consumer-identifying data entered into CCC ONE in connection with a repair or claim, including but not limited to names, home addresses, telephone numbers, vehicle identification numbers, license plate numbers, insurance claim numbers, and policy and vehicle identifiers. CCC's own DPA identifies the categories of Personal Information it processes as "name, email address, home address, and license plate number." That Personal Information records a private event in the consumer's life, a vehicle collision and the resulting repair or insurance claim, and ties that event to the consumer's name, home address, and telephone number, together with the vehicle identification number, the license plate number, and the vehicle mileage (¶¶ 14-16, 27). That Personal Information is not publicly available in that form, and consumers supply it only because a repair or a claim requires it.

150. California Subclass members supplied their Personal Information to collision repair facilities and insurers for the single purpose of obtaining the repair or settlement of their vehicles, and they did not supply it to CCC or know that CCC would receive, retain, aggregate, and commercially use it. Although the CCC ONE estimate bears a footer attributing the product to CCC (¶ 68), nothing in the repair transaction informed consumers that CCC would retain their Personal Information, aggregate it across its network, or use it to build and license commercial products, and nothing afforded them an opportunity to consent or object. The closed flow of repair and claim data, together with the absence of any notice from CCC, made the expectation of California Subclass members objectively reasonable. CCC's website privacy policy gave no different notice:

a consumer who deals only with a repair facility has no occasion to visit CCC's website (¶ 70); no version of the policy in effect from April 2020 through September 2026 mentions artificial intelligence or model training (¶ 77); and the policy tells the consumer that CCC holds repair and claim data as a service provider on behalf of repair shops and insurers (¶ 82). Plaintiffs challenge CCC's retention and use of that Personal Information for CCC's own purposes, apart from and after the repair.

151. CCC's indefinite retention, network aggregation, and commercial exploitation of the California Subclass's Personal Information is a serious invasion of privacy and an egregious breach of the social norms underlying the privacy right, for the following reasons, which operate together and are shown by CCC's own contracts, filings, correspondence, and patents and, where so stated, by allegations on information and belief.

152. First, CCC keeps Personal Information without any fixed limit. The Repair Facility License Agreement provides that CCC's use of the data a repair facility supplies "may continue after the expiration or termination of this Agreement" (¶ 31), and grants CCC "perpetual, royalty-free licenses to use the Content," Content that "may contain nonpublic personal information" (¶ 32). CCC's public privacy policy discloses no fixed retention period and no deletion schedule (¶ 76). When a consumer asked CCC in September 2025 what it held about him, CCC located "one record of a repair with a shop" by his identity (¶ 84), confirming that CCC keeps repair records in a form it can retrieve by the consumer's identity. The '726 Patent describes deletion before retraining only for discontinued parts and for vehicles less likely to be on the road, and does not describe deleting consumers' Personal Information (¶ 64).





Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

153. Second, CCC aggregates Personal Information across its network. CCC has acknowledged in its Form 10-K that a limited number of its solutions process transaction-level data aggregated across its customers, and it reports the volume of historical data it has processed across its network (¶¶ 50, 53) to build what it markets to investors as "proprietary data assets." CCC's public privacy policy further reserves to CCC the right to combine information obtained from other parties with information CCC already holds and to aggregate a consumer's information with the information of other users (¶ 76). The '726 Patent describes historical data, used to generate and train the model, that may include the identity of the insured party, the vehicle owner's name and street address, the location where the loss occurred, the ZIP code where the vehicle is garaged, the driver's name and age, the payout to the insured, and the deductible (¶ 63). On information and belief, CCC's aggregation of repair and claim records across its network links each consumer's identity to the consumer's collisions, claims, insurers, vehicles, and addresses over time, a compilation that no single repair facility or insurer holds and that no consumer agreed to create.

154. Third, CCC uses the California Subclass's Personal Information for CCC's own commercial purposes beyond the repair, including to build products that it licenses to customers other than the repair facility that entered the data. The Repair Facility License Agreement reserves to CCC the use of the data a repair facility supplies "for any internal industry, market, and trend analysis, product improvement, and research and development by, or on behalf of, CCC and its affiliates," a use the agreement does not condition on de-identification (¶ 31). The '726 Patent describes training a model on historical data that includes vehicle owners' names and street addresses (¶ 63), and CCC

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

reports that it has developed more than 400 AI models, some of which are in use across more than 125 insurers and more than 15,000 repair facilities (¶ 51). CCC's contract with insurers confirms that CCC trains its models on the data its customers supply, providing that "CCC may use data to train AI Services" (¶ 41). Whether CCC first de-identifies the Personal Information it uses to build and train these products is known only to CCC (¶ 61). On information and belief, CCC builds and improves its artificial-intelligence models and analytics using Personal Information that repair facilities entered into CCC ONE, in identifiable form, and licenses the resulting products to insurers and repair facilities other than the facility that entered the data.

155. Fourth, CCC's invasion is deliberate, as its own contracts and securities filings demonstrate. The Repair Facility License Agreement grants CCC, insurers, and CCC's vendor perpetual, royalty-free licenses to use repair Content that "may contain nonpublic personal information," requires the repair facility to warrant its authority and to indemnify CCC for any failure to obtain the requisite authorizations, authorizations that consumers never gave, and reserves to CCC the use of customer-supplied data for CCC's own analysis, research and development, and products and services (¶¶ 31-32). CCC has told investors that it anticipates expanding its use and collection of personal information over time (¶ 53), and it has acknowledged to investors since its August 2021 registration statement that personal privacy has become a significant issue (¶ 91), while continuing its practices. CCC's own correspondence with a consumer shows that CCC treats the repair facility or the insurer, and never the consumer, as the source of any authority over the consumer's Personal Information, and that CCC gives the consumer no means to learn from CCC what CCC holds or how CCC uses it (¶¶ 83-85). CCC knows that consumers

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

receive no notice of these uses from CCC. The CCC ONE estimate prepared with the consumer's Personal Information identifies CCC only as the maker of the estimating software and contains no CCC notice, consent, opt-out, access, or deletion term (¶¶ 46, 68), and CCC's own privacy policy tells consumers that CCC handles their repair and claim data "as a service provider on behalf of our customers or clients, such as insurance companies or repair shops" (¶ 82), while CCC's own contracts reserve to CCC the cross-customer uses described above (¶¶ 86-88).

156. California Subclass members received no notice of CCC's role and no opportunity to consent to or refuse CCC's collection, retention, and use of their Personal Information. Nor could they avoid CCC. CCC's platform is embedded across the standard workflows of collision repair and automobile insurance, and a consumer who needs a vehicle repaired cannot learn in advance whether a facility or an insurer routes Personal Information to CCC (¶¶ 95-97).

157. As a direct and proximate result of CCC's invasion of their constitutional right to privacy, California Subclass members lost their protected right to privacy, lost control over the dissemination and use of their Personal Information, and were deprived of the economic value of the Personal Information that CCC converted into revenue. Plaintiffs Burries, Garcia, and Saturné each suffered these injuries, because their Personal Information entered CCC ONE through the estimates described in paragraphs 13 through 16 and, on information and belief, was transmitted to and stored on CCC's servers in identifiable form.

158. The California Subclass is entitled to a declaration that CCC's practices violate Article I, Section 1 of the California Constitution, and to injunctive relief



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

requiring CCC to cease the challenged practices, to provide notice at the point of collection, to obtain consent before any use of Personal Information beyond the estimate or claim, to delete the Personal Information it retains, and to cease using, and to delete or retrain, the artificial-intelligence models, algorithms, and data products it built with that Personal Information, on the terms set forth in the Request for Declaratory and Injunctive Relief (¶¶ 182-183). The California Subclass further seeks nominal damages for the invasion of its members' constitutional right to privacy, and Plaintiffs reserve any individual compensatory damages for the harm to privacy, including damages for mental and emotional distress, for individual proceedings or for a Rule 23(c)(4) issue class. Plaintiffs seek restitution and disgorgement of CCC's enrichment through Counts I and III, and not through this Count.

## COUNT III
## UNJUST ENRICHMENT (QUASI-CONTRACT CLAIM FOR RESTITUTION)
(Pleaded in the Alternative Pursuant to Federal Rule of Civil Procedure 8(d)(2))
(On Behalf of the California Subclass)

159. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

160. Plaintiffs bring this Count on behalf of the California Subclass under California law, and, as to the common measure of CCC's enrichment, as a common issue under Federal Rule of Civil Procedure 23(c)(4), and they plead it in the alternative, pursuant to Federal Rule of Civil Procedure 8(d)(2), to the legal remedies sought in the other Counts, for the reasons stated in paragraph 167. Plaintiffs are members of the California Subclass, and references in this Count to the California Subclass and its members include Plaintiffs. This Count is a claim for unjust enrichment, pleaded as a



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

quasi-contract claim for restitution of the benefit CCC obtained from the Personal Information of California Subclass members.

161. No valid, enforceable contract exists between California Subclass members and CCC governing CCC's collection, retention, or use of their Personal Information, because California Subclass members never interacted with CCC, never agreed to any terms with CCC, and never authorized CCC to collect or use their Personal Information. The Repair Facility License Agreement runs between CCC and the collision repair facilities that license CCC ONE, and it requires the facility to warrant its own authority to grant CCC's licenses and to indemnify CCC for any failure to obtain the requisite authorizations (¶¶ 32, 45, 47), so that California Subclass members are strangers to it. In the absence of an enforceable contract, the law implies a quasi-contractual obligation to prevent CCC from retaining a benefit that in equity and good conscience belongs to California Subclass members.

162. CCC received a benefit from California Subclass members in the form of their Personal Information, which California Subclass members supplied to the repair facilities and insurers handling their repairs and claims and which reached CCC through those intermediaries, including but not limited to their names, residential addresses, telephone numbers, vehicle identification numbers, license plate numbers, insurance policy and claim numbers, vehicle mileage, and the details of their repairs and claims. On information and belief, CCC incorporated Personal Information of this kind into the historical data stores on which it trains the models at the core of its commercial products. CCC states that the historical data it processes across its network allows it "to build proprietary data assets" (¶ 50), and each identifiable record CCC receives and retains for

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

purposes beyond the consumer's own repair adds to those assets when CCC retains it, whether or not CCC has yet used that record to train a model (¶ 61).

163. CCC obtained a benefit of measurable economic value without paying for it, because CCC did not merely store the Personal Information of California Subclass members but aggregated it across its network and built it into trained artificial-intelligence models and analytics that CCC licenses, for a fee, to its customers (¶¶ 23, 51, 54). The breadth of the customer base to which CCC sells the products and analytics it builds upon data aggregated across its network, as CCC reports it in its securities filings (¶ 23), confirms the substantial commercial value of the aggregated data.

164. CCC's retention of this benefit is unjust, and California Subclass members did not confer it gratuitously, for each of the following independent reasons. First, CCC obtained and retains the benefit by invading the legally protected interests of California Subclass members in their Personal Information, without notice to or consent from them (¶¶ 44-47, 61, 94), so that CCC's enrichment lacks any adequate legal basis. Second, California Subclass members supplied their Personal Information under the mistaken understanding that it would travel only from the consumer to the collision repair facility and the insurer to estimate, repair, and settle the consumer's loss (¶ 1), an understanding that CCC knew its practices left uncorrected (¶¶ 89-93). Third, CCC obtained the benefit by concealment: CCC knew that its practices implicate consumer privacy (¶¶ 89-93); the CCC ONE estimate names CCC but discloses nothing of CCC's retention, aggregation, or commercial use of the Personal Information (¶¶ 14-16, 68); no version of CCC's website privacy policy in effect from April 2020 through September 2026 mentions artificial intelligence or model training (¶ 77); and when a consumer asked, CCC described itself

as a service provider and refused to act (¶¶ 82-85). California Subclass members' Personal Information reached CCC because collision repair facilities supplied it to CCC under CCC's own form license agreements. The repair estimate and the repair were the only things California Subclass members received in exchange for supplying their Personal Information, and they supplied it to the collision repair facility for that purpose alone (¶ 1). They paid nothing to CCC, received nothing from CCC, and received no part of the value CCC derived from its use of their Personal Information beyond preparing or transmitting the estimate (¶ 58). It would be inequitable and unjust for CCC to retain the value it derived from that Personal Information without compensating the consumers whose Personal Information it took. Because this Count rests on the mistake and the concealment described above, it did not accrue until Plaintiffs discovered the facts constituting them (¶¶ 103-108).

165. CCC's own filings with the Securities and Exchange Commission confirm the commercial scale of the data it aggregates (¶¶ 50, 53). CCC's reported revenue for its fiscal year ended December 31, 2025 (¶ 59), on information and belief, is derived in part from products and analytics that CCC builds upon data aggregated across its network, including Personal Information. The enrichment subject to restitution is the portion of CCC's gain attributable to CCC's use of the California Subclass members' Personal Information for commercial purposes beyond preparing or transmitting their repair estimates, and not CCC's undifferentiated total revenue, and it excludes revenue attributable to CCC's January 2025 acquisition of EvolutionIQ, a provider of artificial-intelligence guidance for disability and injury claims whose products are not derived from the repair and claim Personal Information of the California Subclass.

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

166. CCC's retention of this benefit is ongoing, because CCC's models, once trained on the Personal Information of California Subclass members, continue to generate value each time CCC licenses access to an artificial-intelligence product or processes a claim through a model built on that Personal Information, and CCC has stated that it anticipates expanding its use and collection of personal information over time. CCC's benefit does not depend on licensing fees. On information and belief, the identifiable Personal Information CCC retains is valuable to CCC because CCC possesses it, as part of what CCC calls its "proprietary data assets" (¶ 50), whether or not anyone pays CCC for access to it, and the artificial-intelligence models CCC develops from that Personal Information are themselves valuable intellectual property that CCC owns, whether or not CCC licenses them.

167. The California Subclass lacks an adequate remedy at law for the disgorgement of profits and the constructive trust sought in this Count. The legal remedies sought in the other Counts are not equally prompt, certain, and complete. Nominal damages under Counts I and II measure the invasion of Subclass members' rights, not CCC's gain, and individual compensatory damages are reserved for individual proceedings. The disgorgement sought in this Count is measured by the net profits CCC derived from its use of the California Subclass members' Personal Information beyond preparing or transmitting their repair estimates, an amount that is not identical to, and may exceed, any damages measured by the California Subclass's loss or by the reasonable value of CCC's use. CCC's enrichment is also not limited to net profits. On information and belief, CCC's possession of aggregated, identifiable Personal Information, the artificial-intelligence models it built from that Personal Information, and its licensing of those models give

CCC increased market share, competitive advantage over providers that lack comparable data, reputational advantage with insurers, repair facilities, and investors, and other material advantages, independently of any direct licensing profit (¶¶ 23, 48, 50-51), and no award of damages measured by the California Subclass's loss reaches those benefits. Because CCC's models, once trained on that Personal Information, continue to generate revenue each time CCC licenses them (¶ 166), a money judgment for past harm will not reach the gains CCC continues to derive after judgment, and only a constructive trust over the datasets and models derived from that Personal Information, and over the revenue CCC receives from licensing those models, will prevent CCC from continuing to profit from it.

168. The California Subclass is entitled to restitution of the enrichment CCC obtained through its use of its members' Personal Information beyond preparing or transmitting their repair estimates, in the form of a money judgment measured by the reasonable value of that use, which is the expense CCC saved by using that Personal Information rather than paying for the right to use it or equivalent data. In the alternative, and for the reasons stated in paragraph 167, the California Subclass is entitled to disgorgement of the net profits CCC derived from that use and attributable to the Personal Information of the California Subclass, and not CCC's total revenue, excluding revenue attributable to CCC's January 2025 acquisition of EvolutionIQ (¶ 165), and to a constructive trust over the identifiable property in CCC's possession derived from that Personal Information, including, on information and belief, the datasets in which CCC retains it and the models trained on it (¶¶ 61, 162, 166), and the revenue CCC receives from licensing those models. The enrichment subject to restitution and disgorgement



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

includes, in addition to net profits, the value to CCC of the aggregated, identifiable Personal Information it holds, of the artificial-intelligence models it developed from that Personal Information, and of the market share and the competitive, reputational, and other material advantages they confer (¶¶ 166-167), whether or not those benefits produce direct licensing revenue, in each case to the extent attributable to the Personal Information of the California Subclass and excluding EvolutionIQ (¶ 165). Any classwide award may be allocated among California Subclass members in proportion to the number of their records that CCC retained and used beyond preparing or transmitting their estimates.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
(Cal. Bus. & Prof. Code § 17200 et seq.)
(On Behalf of the California Subclass)

169. Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

170. The California Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice," and CCC's collection, aggregation, and commercial use of the Personal Information of California Subclass members violates its unlawful and unfair prongs. Plaintiffs are members of the California Subclass, and references in this Count to the California Subclass and its members include Plaintiffs.

171. California Subclass members have suffered economic injury and lost money or property as a result of CCC's business practices. Each Plaintiff's Personal Information was entered into CCC ONE through the estimate described in paragraphs 13 through 16, and, on information and belief, CCC retains it in identifiable form. Personal Information



Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

of this kind is licensed for value in the market for repair and claim data: CCC's form contracts require the businesses that supply it to grant CCC full right and authority to use it, grant CCC, insurers, and CCC's vendor perpetual, royalty-free licenses to use repair Content that may contain nonpublic personal information, permit CCC's use to continue after the agreement ends, and forbid the repair facility and the independent appraiser to compile that data into a database or to aggregate it (¶¶ 31-36), and CCC builds products from data aggregated across its network that it licenses to insurers and other customers for a fee (¶¶ 50-54, 58). Because CCC took and keeps a perpetual, licensable copy of each Plaintiff's Personal Information without notice, consent, or payment, and refuses to act on a consumer's request concerning the record it holds (¶¶ 83-85), each Plaintiff has lost the ability to withhold their Personal Information from that market, to exclude CCC and CCC's licensees from using it, or to condition its use on their consent or on compensation, and their present and future property interest in their Personal Information has been diminished. CCC's reported revenue of $1,057.0 million for fiscal year 2025 (¶ 59), derived, on information and belief, in part from products and analytics that CCC builds upon Personal Information aggregated across its network, is consistent with the commercial value of that Personal Information.

172. California Subclass members lack an adequate remedy at law for the equitable relief they seek under the Unfair Competition Law. Money damages cannot stop CCC's ongoing collection, retention, and use of Personal Information, which CCC anticipates expanding (¶ 53): on information and belief, CCC continues to retain each Plaintiff's Personal Information in identifiable form today and to use Personal Information of this kind in the products it licenses (¶¶ 51, 54), and each Plaintiff drives a vehicle and, in the

ordinary course, will again need collision repairs handled by repair facilities that use CCC ONE. No award of money restores to Plaintiffs the Personal Information that CCC continues to hold, and no later de-identification by CCC undoes CCC's retention of the identifiable record (¶ 61). To the extent Plaintiffs seek restitution under the Unfair Competition Law, they seek it in the alternative to the legal remedies sought in the other Counts, which seek on a classwide basis only nominal damages and reserve individual compensatory damages for later proceedings.

**A. Unlawful Business Practices**

173. CCC's collection, retention, and commercial use of Personal Information without notice or consent is a serious invasion of the right to privacy guaranteed by Article I, Section 1 of the California Constitution, and an intentional intrusion upon seclusion under California common law, and each of those violations of California law independently supports the unlawful prong of the Unfair Competition Law. For the limited purpose of identifying these predicate violations, Plaintiffs adopt by reference under Federal Rule of Civil Procedure 10(c) the allegations of paragraphs 130 through 144 and 147 through 157, and they do not rely on the California Consumer Privacy Act as a predicate.

**B. Unfair Business Practices**

174. CCC's practices inflict substantial injury on consumers, because consumers lose control over their Personal Information, are subjected to commercial exploitation they did not authorize, and are denied the economic value of their Personal Information, and that injury is not outweighed by any countervailing benefit to consumers or to competition, because CCC's practices serve the commercial interests of CCC and its





Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

business customers rather than the consumers whose Personal Information CCC takes. CCC's practices are also immoral, unethical, oppressive, and substantially injurious to consumers, and their harm to consumers outweighs their utility. CCC's retention and cross-customer commercial use of identifiable Personal Information confer no benefit on the consumer beyond what the preparation and transmission of the estimate already provide, and CCC's own contracts contemplate that its research, development, and product uses can proceed on de-identified data (¶¶ 37, 43, 61). CCC's use of Personal Information processed for one business to build products that it licenses to other customers also exceeds the internal-use limit that defines a service provider under the Service-Provider Regulation (¶¶ 87-88). Consumers could not reasonably have avoided the injury, because nothing in the CCC ONE estimate or in any document presented to them informed them that CCC retains their Personal Information, aggregates it across CCC's network, or uses it to build and license commercial artificial-intelligence products, CCC's website privacy policy, which appears only on CCC's own website, frames CCC as a "service provider," routes California privacy requests to the insurer or repair facility, and gives no notice of any such use (¶¶ 70-77, 82), and a consumer who asks CCC directly is told that CCC "cannot take any action" (¶¶ 83-85). CCC is aware of consumers' inability to protect their interests in their Personal Information and takes advantage of it, because CCC requires the repair facilities that supply the Personal Information to warrant their authority and to indemnify CCC for any failure to obtain the requisite authorizations (¶¶ 32, 45, 47), while turning away the consumer who asks CCC directly.

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

175. CCC's practices also offend the public policy of informational privacy embodied in Article I, Section 1 of the California Constitution, a policy that the California Legislature has further expressed in the California Consumer Privacy Act.

176. The injuries of California Subclass members were caused by CCC's unlawful and unfair business practices, because CCC's retention, aggregation, and commercial use of their Personal Information, which CCC did not disclose to them, deprived them of the opportunity to protect their Personal Information, to withhold it, or to demand compensation for its use.

177. The California Subclass is entitled to an order under California Business and Professions Code section 17203 restoring to its members the property that CCC acquired from them by means of its unlawful and unfair business practices, namely their Personal Information, through restitution of the value of the Personal Information that CCC acquired from them and the deletion of the Personal Information that CCC retains beyond the transaction in which it was collected. Plaintiffs do not seek damages or nonrestitutionary disgorgement of profits under the Unfair Competition Law, and they pursue the disgorgement of CCC's profits and the imposition of a constructive trust through Count III. The California Subclass is further entitled to injunctive relief ordering CCC to cease its unlawful and unfair practices, to provide notice at the point of collection to California consumers, and to obtain consent before any use of their Personal Information beyond preparing or transmitting their repair estimates.

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

**REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**

(On Behalf of the Nationwide Intrusion Subclass and the California Subclass)

178. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth in this section.

179. Plaintiffs seek declaratory and injunctive relief under the Declaratory Judgment Act and the equitable powers of this Court, on a classwide basis under Federal Rule of Civil Procedure 23(b)(2), because CCC has acted on grounds that apply generally to the Nationwide Intrusion Subclass and the California Subclass, and in the alternative under Federal Rule of Civil Procedure 23(c)(4) as to the common questions identified in the class allegations above. The injunction terms anchored in California law are sought on behalf of the California Subclass.

180. An actual and justiciable controversy exists between Plaintiffs and CCC. Plaintiffs contend that CCC's collection of Personal Information through CCC ONE without notice to consumers, its retention of that Personal Information and aggregation of transaction-level data across its customers, and its use of that Personal Information to develop and to license artificial-intelligence products and analytics to other insurers and customers violate the common law of intrusion upon seclusion of each State in which a member's estimate was prepared, as to the Nationwide Intrusion Subclass, and California common law, as to the California Subclass, and violate Article I, Section 1 of the California Constitution and the Unfair Competition Law, as to the California Subclass. CCC has given no indication that it intends to cease these practices, and it tells investors that it anticipates expanding its use and collection of personal information over time.

181. Plaintiffs have no adequate remedy at law, because monetary relief alone cannot stop CCC's ongoing collection, retention, and use of Class Members' Personal Information. CCC continues to collect Personal Information from consumers through the CCC ONE platform and, on information and belief, continues to retain that Personal Information and to use it in the artificial-intelligence models it licenses to insurers and repair facilities (¶¶ 51, 54). The threatened injury to Plaintiffs is continuing. On information and belief, CCC continues to retain each Plaintiff's Personal Information in identifiable form and to use it in the data assets and artificial-intelligence products it licenses to insurers and repair facilities (¶¶ 50-54), and nothing in the CCC ONE estimate or in CCC's privacy policy indicates that CCC will stop. Each Plaintiff drives a vehicle and, because no Plaintiff can learn before choosing a repair facility whether it routes Personal Information to CCC (¶ 96), no Plaintiff can protect against CCC's practices in any future repair. No basis exists to conclude that CCC will alter its practices absent an order of this Court: the CCC ONE estimate still contains no CCC notice or consent language, and CCC turned away a consumer's written request for his data as recently as October 2025 (¶¶ 83-85).

182. Plaintiffs seek a permanent injunction under Federal Rule of Civil Procedure 23(b)(2), binding CCC and its officers, agents, servants, employees, successors, and assigns, that (a) bars CCC from using the Personal Information of members of the Nationwide Intrusion Subclass and the California Subclass that a collision repair facility entered into CCC ONE for artificial-intelligence training, product development, analytics, or any other commercial purpose beyond preparing or transmitting a repair estimate or total-loss valuation for the transaction in which the Personal Information was collected,

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

unless CCC first obtains the consumer's informed consent; (b) requires CCC, which discloses no fixed retention period or deletion schedule, to delete the Personal Information of members of the Nationwide Intrusion Subclass and the California Subclass that a collision repair facility entered into CCC ONE during the Class Period without their consent, to the extent that Personal Information is not necessary to a current repair or claim transaction; (c) bars CCC from using, licensing, or deploying any artificial-intelligence model, algorithm, or data product that CCC trained or developed using that Personal Information without the consumer's informed consent; (d) requires CCC to delete each such model, algorithm, or data product or, to the extent the Court permits, to retrain it without that Personal Information; and (e) requires CCC to certify to the Court its compliance with terms (a) through (d). Terms (a) through (e) remedy the violations alleged in Counts I, II, and IV and are sought nationwide on behalf of the Nationwide Intrusion Subclass as to Count I and on behalf of the California Subclass as to Counts II and IV.

183. Plaintiffs further seek, on behalf of the California Subclass, an injunction requiring CCC to provide notice to consumers whose Personal Information a collision repair facility in California enters into CCC ONE, at or before the point of entry, that discloses CCC's identity, the categories of Personal Information CCC collects, and the purposes for which CCC uses that Personal Information, and requiring CCC to obtain the consumer's consent before using Personal Information for any purpose beyond preparing or transmitting the estimate or valuation for that transaction. Plaintiffs seek this notice and consent relief as a remedy for the violations alleged in Counts I, II, and IV.

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

184. Plaintiffs seek, on behalf of the Nationwide Intrusion Subclass, a declaration that CCC's collection and use of Class Members' Personal Information as alleged in this Complaint violates the common law of intrusion upon seclusion of the State in which each member's estimate was prepared, and Plaintiffs seek, on behalf of the California Subclass, a declaration that the same conduct violates California common law, Article I, Section 1 of the California Constitution, and the Unfair Competition Law, and a declaration that CCC's continued retention and use, without notice and consent, of the Personal Information of members of the California Subclass for purposes beyond preparing or transmitting their repair estimates violates Article I, Section 1 of the California Constitution and the Unfair Competition Law.

185. The requested declaratory and injunctive relief will benefit the Nationwide Intrusion Subclass, the California Subclass, and the public, because it will stop CCC's unlawful practices, will remove from CCC's systems the Personal Information and the artificial-intelligence models built from it, and will ensure that consumers receive the notice and the choice to which the law entitles them. The balance of equities favors Plaintiffs, because CCC has no legitimate interest in collecting and exploiting Personal Information without notice or consent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs LaTrenda Burries, Gloribel Garcia, and Katleen Saturné, individually and on behalf of all others similarly situated, pray for judgment against CCC as follows:

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

1. For an order certifying this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

2. For an award of nominal damages to the members of the Nationwide Intrusion Subclass and the California Subclass, as permitted by the law governing each member's claim, with any individual compensatory and emotional-distress damages reserved for individual proceedings or a Rule 23(c)(4) issue class;

3. For restitution and disgorgement, without duplication, of the profits, benefits, and value that CCC obtained through its use of Class Members' Personal Information beyond preparing or transmitting their estimates and claims, measured by CCC's enrichment according to proof, in the form of the reasonable value of CCC's use or, in the alternative, CCC's net profits attributable to that use, together with the value of the data assets, artificial-intelligence models, and market, competitive, and reputational advantages CCC derived from that Personal Information, allocated among the Subclass members in proportion to their records that CCC retained and used beyond preparing or transmitting their estimates, together with the imposition of a constructive trust over the identifiable property derived from that Personal Information, on behalf of the California Subclass through the unjust enrichment claim in Count III and on behalf of the Nationwide Intrusion Subclass through the intrusion claim in Count I to the extent the law governing each member's claim permits gain-based recovery, and excluding from that measure the profits attributable to CCC's January 2025 acquisition of EvolutionIQ, together with an order under the Unfair Competition Law in Count IV, on behalf of the

California Subclass, for restitution of the value of the Personal Information CCC acquired and for deletion of the Personal Information CCC retains;

4. For an award of punitive or exemplary damages, including, for the California Subclass, under California Civil Code section 3294, as allowable by law;

5. For a permanent injunction on the terms set forth in the Request for Declaratory and Injunctive Relief above, binding CCC and its officers, agents, servants, employees, successors, and assigns, including an order (a) barring CCC from using the Personal Information of members of the Nationwide Intrusion Subclass and the California Subclass for any purpose beyond preparing or transmitting their estimates without their informed consent; (b) requiring CCC to delete that Personal Information; (c) barring CCC from using, licensing, or deploying any artificial-intelligence model, algorithm, or data product trained or developed with that Personal Information; (d) requiring CCC to delete each such model, algorithm, or data product or, to the extent the Court permits, to retrain it without that Personal Information; (e) requiring CCC, as to the California Subclass, to give notice at or before the point of collection and to obtain consent before any further use; and (f) requiring CCC to certify its compliance to the Court;

6. For a declaration, on behalf of the Nationwide Intrusion Subclass, that CCC's conduct as alleged in this Complaint violates the common law of intrusion upon seclusion of the State in which each member's estimate was prepared, and a declaration, on behalf of the California Subclass, that the same conduct violates California common law, Article I, Section 1 of the California Constitution, and the Unfair Competition Law;

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

Law Offices of Maro Burunsuzyan, A Professional Law Corporation
800 North Brand Boulevard, 8th floor, Glendale, CA 91203

7. For an award of reasonable attorneys' fees and costs under California Code of Civil Procedure section 1021.5 as to the claims of the California Subclass under California law, the common fund doctrine, and any other applicable law;

8. For reimbursement of the costs and expenses that Plaintiffs incurred in connection with this action;

9. For pre-judgment and post-judgment interest at the maximum rate permitted by law; and

10. For such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable raised by this Complaint.

Dated: October 8, 2026

Respectfully submitted,

**LAW OFFICES OF MARO BURUNSUZYAN, A Professional Law Corporation**

By: /s/ Maro Burunsuzyan

Maro Burunsuzyan (SBN 175369)
Simon Y. Song (SBN 283269)

Attorneys for Plaintiffs and the Proposed Class